Mr. Justice STEONG
delivered the opinion of the court.
This was a proceeding under the acts of Congress of August 6th, 1861, and July 17th, 1862, to confiscate shares of stock in two corporations created by the State of Michigan. The stock had been seized by the marshal of the district, acting indirectly under orders of the President of the United States. The marshal made return to the district attorney that he had seized it, with all dividends, interest, and moneys due thereon, specifying in his return the stock-certificates by which it was represented, and describing the mode of seizure to have been serving a notice thereof personally upon the vice-president of one company, and upon the president of the other. An information was then filed in the District Court, in the nature of a proceeding in rem, against the stock, averring it to be the property of Samuel Miller, of Amherst County, Virgina, a rebel citizen and inhabitant of the United States. The information further averred that the said Miller was one of the persons described in the several clauses of the 5th section of the act of 1862, and also that within the States of Virginia and South Carolina, after the passage of the act, being engaged in armed rebellion against the government of the United States, and being engaged in aiding and abetting such a'rmed rebellion, he did not, within sixty days after the proclamation (mentioned in the 6th section) had been made by the President, cease to *293 aid, countenance, and abet said rebellion, and did not and would not return to his allegiance to the United States. Upon the information thus filed a warrant and monition-were issued, commanding the marshal to hold the stocks and property thus described, the same having been by him duly seized, until the further order of the court touching the same, and to give notice, as prescribed, that all persons having any interest in said property, or having anything to say why the same should not be condemned as enemy’s property and sold, according to the prayer of the libel, might appear before the court at a time designated therein and make their allegations in that behalf. To this writ or monition, the marshal returned as follows: “I hereby certify and return that I have seized and now hold all the property described in the within writ” (the stocks aforesaid), “and now hold the same subject to the future order of said court, and have given notice to all persons interested therein, by publication, as required in the within writ.” The record then shows that on the day designated iu the monition, after default of all persons had been duly entered, and after reading the depositions which had been taken on behalf of the United States, the shares of stock were condemned as forfeited and a writ of venditioni exponas was ordered, under which they were sold. After this Miller applied by petition to the District Court, praying that the decree of condemnation might be opened and set aside, but the prayer of the petition was denied. The case was then removed to the Circuit Court by writ of error, and the decree having been affirmed, the record has been brought into this court for review. '
We notice at the outset an objection urged against the competency of the. plaintiff in error to sue out the writ which-briugs the ease here, on the ground that he was not a claimant in the District Court, only to say that it is set at rest by the decision made iu Mc Veigh v. United States, a case decided at this term.*
Assuming, then, that the ease is properly in this court, *294 and that the plaintiff in error has a right to be heard, we proceed to notice the errors assigned.
The first is, that there was no such seizure of the stocks as gave the court jurisdiction to condemn them as forfeited, and to order their.sale.
This was a fatal error, if the fact was as claimed. In revenue and admiralty cases a seizure is undoubtedly necessary to confer, upon the court jurisdiction over the thing when the proceeding is in rem. In most such cases the res Is movable personal property, capable of actual manucaption. Unless taken into actual possession by an officer of the court, it might be eloigned before a decree of condemnation could be made, and thus th,e decree would be ineffectual. It might come into the possession of another court, and thus there might arise a conflict of jurisdiction and decision, if actual seizure and retention of possession were not necessary to confer jurisdiction over the subject. But how can it be maintained there was no sufficient seizure in this case? The record shows one. The marshal returned to the warrant that he had seized the property, and that he then held it subject to the further order of the court. Why is not this conclusive? Can a sheriff’s or marshal’s return to a writ be contradicted by a plaintiff in error? It is true the return did not describe the mode of seizure, but neither the writ- nor the law required that more than the fact should he stated. The return met all the exigencies of the writ. It cannot- be presumed, in the face of the record, that an illegal seizure was made, or that some act was done that did not amount to a seizure. But it is said the warrant with monition did' not require the marshal to seize; that it only commanded him to hold the stock, the same having been by Mm duly seized, until the further order of the court. Whether this was not an order to seize, as well as to hold after seizure, we need not determine. Confessedly the object of the writ was to bring the property under the control of the court and keep it there, as well as to give notice to the world. These objects would have been fully accomplished if its direction had been nothing more than to hold the property subject to *295 the order of the court, and to give notice. The marshal had already seized the stock, and it remained in his possession. An order' to seize property already in his hands would have been superfluous. All that was needed was that, having the property, he should hold it subject to the order of the court. Thus held by its officer, the jurisdiction was complete. But the writ was'larger. It commanded him to hold the property, it having been duly seized; and he returned a seizure. The act of Congress does not require that proceedings in confiscation shall conform precisely to those in admiralty or revenue cases, but only “ as near as may be.” They must be adapted to the peculiarities of the case, following proceedings in admiralty and revenue so nearly as may be, consistently with the objects Congress had in view. Yet even in admiralty it cannot be doubted, if a warrant with a monition should command a marshal to hold goods already in his possession until the further order of the court touching the same, and he should return that he had seized them, and that he held them as required, the jurisdiction of the court over them would be complete. To hold otherwise would be to sacrifice the spirit to the letter of form, the substance to the shadow.
It is insisted, however, that inasmuch as the return to the warrant is silent respecting the mode of seizure, we may look to the seizure made by the marshal under the executive order before the information was filed. That was made by direction of the district attorney, acting under authority of the President, and the marshal, in reporting his action, returned that he seized the stock “ by serving a notice of said seizure personally upon the vice-president of one company, and upon the president of the other.” It is assumed that the judicial seizure made under the judicial warrant was made in the same way, or that it was the same seizure, and it is argued that the action of the marshal did not amount to a seizure effectual to bring the property within the jurisdiction of the court. The first observation we have to make in regard to this is, that the plaintiff’ in error has no right to make any such assumption. It is justified by *296 nothing in the record. True, a seizure under order of the President was necessary to warrant the institution of judicial proceedings for confiscation, and it may be, therefore, a proper inquiry whether what the marshal did under the executive order amounted to such a seizure. But the marshal’s return to the judicial warrant, and his report to the district attorney, spéak of distinct transactions, occurring at different times aud under different directions. Waiving this, however, and assuming that the manner of seizure spoken of in the return to the warrant and monition was the same as that described in the report to the district attorney, we are of opinion the seizure was good and effective, sufficient to give the court jurisdiction over the property.
The act of Congress of July 17, 1862, made it the duty of the President to cause the seizure of all the estate,.property, money, stocks, credits, aud effects of the persons described, and in order to secure the condemnation and sale of such property, after its seizure, directed judicial proceedings, in rem, to be instituted. It contemplated that every kind of property mentioned could be seized effectually in some mode. It had in view not only tangible property, but that which is in action. It named stocks and credits; but it gave no directions respecting the mode of seizure. It is, therefore, a fair conclusion that the mode was intended to be such as is adapted to the nature of the property directed to be seized, and in use in courts of revenue and admiralty. The modes of seizure must vary. Lauds cannot be seized as movable chattels may. Actual manucaption cannot be taken of stocks and credits. But it does not follow from this that they are incapable of being seized, within the meaning of the act of Congress. Seizure may be either actual or constructive. It does not always involve taking into manual possession. Even in case of chattels movable, taking part of the goods in a house, under a fi. fa.., in the name of the whole, is a good seizure of all.* An assertion of control, with a present power and intent to exercise it, is sufficient. *297 "We are told there is no statute in Michigan that authorizes the- service of mesne process upon a corporation for the attachment of its stock. Be it so. That does not show that stocks cannot be seized or attached when Congress orders a seizure. Federal officers and Federal courts are not dependent upon State legislation for power to laj' hold of property. Can it be that the government may seize credits and corporation stocks of public enemies in those States where provision is made by State legislation for modes of seizure of such property, but may not seize similar property of the same enemies in other States where there are no such statutes? There is, however, such a thing as seizure of corporation stocks in Michigan on final process, effected by service of a copy of the writ on an officer of the corporation, and similar modes of seizure are in use in most, if not in all, the States. Garnishment almost everywhere exists. What is that but substantial attachment? It arrests the property in the hands of the garnishee, interferes with the owner’s or creditor’s control over it, subjects it to the judgment of the coui’t, and therefore has the effect of a seizure. In all cases where the garnishee is a debtor, or where the garnishment is of stocks, it is effected by serving notice upon the debtor, or corporation. A corporation holds its stock, as a quasi trustee, for its stockholders. The service of an attachment, though it is but a notice, binds the debt or the stock in the hands of the garnishee, from the time of the service, and thenceforward it is potentially in 11 gremio legis.” The statute declares that proceedings to confiscate shall conform, as nearly as may be, to proceedings in admiralty or revenue cases. Now, it is legitimate in certain proceedings in courts of admiralty to attach credits and effects of such an intangible nature that they cannot be taken into actual possession by the marshal, and the mode of attachment is by notice, dependent upon no statutory enactment. See Manro v. Almeida * In that case, reference was made approvingly to Gierke’s Praxis,† where it appears that it is consistent with *298 the practice of the admiralty, in cases where there is no property which the officer can attach by manucaption, to attach goods or credits in the hands of third persons, by means of the simple service of a notice. The language of this court was, that, “as goods and credits, in the hands of a third person, wherever situated, may be attached by notice, there cannot be a reason assigned why the goods themselves, if accessible, should not be actually attached, and although it is very clear that the process of attaching by notice seems given as the alternative when the officer cannot have access to the goods themselves, yet all this may be confided to the discretion of the judge who orders the process.”* These are, indeed proceedings to. compel appearance, but they are, nevertheless, attachments or seizures, bringing the subject seized within the control of the court, and, what is of primary importance, they show that, in admiralty practice, rights in action, things intangible, as stocks and credits, are attached by notice to the debtor, or bolder, without the aid of any statute.
It was in this mode, known to the courts, and dependent on no statute, that the marshal seized the stock of the plaintiff in error. It is impossible for us to hold that his act was no sufficient seizure.
A single observation more upon this part of the case. The eighth and the fourteenth sections of the act of 1862 empowered the courts to make orders and decrees, to issue process, and do all other things necessary to fitly and efficiently carry out the purposes of the act, which were to seize and confiscate (inter alia) stocks and credits. Under this authority the court might have made an order, had it. been necessary, prescribing as the mode of seizure precisely what the marshal did. And, if so, it would be difficult to maintain that, in proceeding to adjudicate upon the stocks, there was not a recognition of the marshal’s action, as a valid seizure, equivalent to an antecedent order thus to seize. The decree expressly declared that the stocks had been seized.
*299 The second assignment of error is, that there was no'such hearing and proof in the case as was necessary to a valid decree of condemnation. Whether this assignment is well made must be determined by the record. That shows an information containing averments of all facts necessary to warrant a decree of condemnation. It shows a warrant and monition, return of seizure and publication of notice, and a decree setting forth that the warrant of confiscation and monition having been duly made, and the default of all persons having been duly entered, it was thereupon, on motion of the district attorney, and on reading and filing the depositions taken on behalf of the United States, ordered, sentenced, and decreed by the court that the shares of stock standing in the name of Samuel Miller on the books of the companies, and belonging to him, which had been before seized by the marshal in this proceeding, be condemned as forfeited to the United States. Thus it appears a default was duly entered to a monition, founded on an information averring all necessary facts; that the decree was entered on motion, after default, and after reading depositions taken on behalf of the United States.
But it is insisted the District Court did nqt find that the stocks belonged to a person engaged in the rebellion, or who had given aid or comfort theretq, which, it is said, are made necessary findings by the seventh section of the act, before a decree of condemnation can be entered.
This is not an objection to the jurisdiction of the court. We have already shown that was complete. It is an objection to the regularity of proceeding, and it assumes that the record must show affirmatively there was no irregularity. It presumes, therefore, against the record. . The general rule, however, is, that in courts of record all things are presumed to have been rightly done.* In courts of limited jurisdiction, indeed, there is a presumption against jurisdiction, but when that appears they are entitled to the same presumptions in favor of their action as other courts are. *300 The district and circuit courts are of limited jurisdiction, but they are not inferior courts, and they are therefore entitled to the same presumptions in their favor. Those presumptions are that the court, having jurisdiction, and having entered a judgment, did everything that was necessary to warrant its entry of the judgment. Undoubtedly the contrary may be shown in a court of error, but the burden of showing it is upon him who alleges error. The legal intendment is against him. This doctrine is abundantly sustained by the authorities. Thus, in Railroad Company v. Stimpson,*.whibh was a patent case, Judge Story said, “It is a presumption of law that all public officers perform their official duties until the contrary is proved. And when,” said he, “an act is to be done, or patent granted, upon evidence and proofs to be laid before a public officer, upon which he is to decide, the fact that he has done the act, or granted the patent, is primd facie evidence that the proofs have been regularly made and were satisfactory. It is not then necessary for the patent to contain any recitals that the prerequisites to the grant of it have been duly complied with, for the law makes the presumption.” And in Gi'ignon’s Lessee v.-Aslor,† which related to a proceeding in rem, and where the order of sale did not set out the facts which, under the law, must have existed before a sale could be decreed, Mr. Justice Baldwin said, “ The record of the county court shows that there was a petition representing some, facts by the administrator, who prayed an order of sale; that the court took those facts which were alleged in the petition into consideration, and for these and divers other good reasons, ordered that he be empowered to sell. It did then appear to the court that there were.facts and reasons before them that brought their power into action', and that it was exercised by granting the prayer of the petitioner, and the decree of the court does not specify the facts and reasons, or refer to the evidence on which they were made to appear to the judicial eye; they must have been, and the law presumes *301 that they were, such as to justify this action.” So in Erwin v. Lowry * Mr. Justice Catron, in delivering the judgment of the court, said, “We hold that wherever a judgment is given by a court having jurisdiction of the parties, and of the subject-matter, the exercise of jurisdiction warrants the presumption, in favor of 'a purchaser, that the facts, which were necessary to be proved to confer jurisdiction, were found.”
It is not, however, necessary to invoke the maxim, “ omnia presum.unter rite acta esse," in support of this record. It appears, affirmatively, that all the facts were found or estab- ' lished which, under the act of Congress, were essential to justify the judgment. It has been observed the information set out that the stocks belonged to Samuel Miller, aud that he was a person engaged in the rebellion, -who had given aid or comfort thereto; that monition was duly made, and that there was default of all persons to appear and claim or • show cause why the-property should not be condemned as enemy’s property. The default appears to have been duly entered. Were this, then, a proceeding according to the forms of a common law action, the facts averred by the information would be considered as established or confessed, and everything found necessary for a judgment. The effect of a default to appear in an admiralty or a revenue proceeding is ordinarily the same as in other actions at law. It is a virtual confession. In Benedict’s Admiralty,† the practice in proceedings in rem is stated to be, if no one appears in response to the proclamation for all persons having anything to say why the property should not be condemned to come forward and make their allegations in that behalf, that, on motion of the libellant’s proctor, the defaults' are entered, and a decree of condemnation and sale is made on a brief statement by the proctor of the cause of action. When the libellant’s claim may not cover the whole value of the property, there is a subsequent hearing to ascertain the amount to which the libellant is entitled, but the decree of condemnation and sale is entered on the default alone.. So the same *302 author says,* “In cases of seizure, when no one appears, the decree of condemnation is absolute, the only question being whether the property be forfeited or not. In such cases it is usual for the district attorney, on his motion for condemnation, to state briefly the substance of the libel and the cause of forfeiture.” In United States v. The Schooner Lion,† Judge Sprague admitted that in some cases condemnation followed default of necessity without a hearing, though, in the case then before him, he held that some hearing was necessary, because the act of Congress under which the forfeiture was then sought (that of fishing vessels for violations of law in obtaining fishing bounties) provided that after default the court should proceed to hear and determine the cause according to law. The act under which these proceedings have been taken makes no such requisition; and even in United States v. Lion, Judge Sprague said, to what extent there must be a hearing must depend upon the circumstances of the case. The court, said he, will at least examine the allegations of the libel to see if they are sufficient in law, and the return of the marshal, and such affidavit tor .affidavits as the district attorney shall submit. He added that a wilful omission by the owners to answer might of itself satisfy the court that a forfeiture should be decreed. This, in a case where the statute required a hearing after default. In the present case, though governed by no such requirement, the court did examine the depositions, and then, on motion of the district attorney, condemned the property. We have said the acts of 1861'and 1862 do not require any hearing after a default has been duly entered, as did the act! relative to forfeitures for violations of law respecting fishing bounties. It has been suggested, however, the act qf 1789 directs that, in admiralty proceedings, there shall be a hearing after default. But there is no warrant for the suggestion. The act of 1789 contains no such provision. Neither the 19th section, nor any other part of the act, can be construed as making any such requirement. No change is made in the usual course of admiralty proceedings.
*303 There is no essential difference between the forms of proceeding or the practice in revenue cases and those in adm ralty, except where there are disputed facts. The form are described in Manning’s Exchequer Practice.* There appears that, though generally there is one proclamation to call in claimants, then an appraisement, and a second proclamation inviting bidders for more than the appraisement, many condemnations appear in the old records upon a single proclamation. Default to the first is a default of claimants; default to the second is a default of bidders.† Throughout the chapter condemnation by default is treated as in accordance with the practice of the courts in such cases. In Attorney-General v. Lade,‡ may be found an entire record of a revenue proceeding in rem to forfeit gold and silver coin seized for attempted exportation out of the realm, contrary to acts of Parliament. The record, after reciting the information, seizure, &c., proceeds as follows: “Whereupon, proclamation being made for his said Majesty, as the custom is, that if any one would inform the court here why the said several pieces of gold and silver coin of this realm, and also the said several pieces of foreign gold coin, should not, for the reasons aforesaid, remain forfeited, he might come and he should be heard, and no one appearing to do this, it is adjudged by the barons here that the said several pieces of gold and silver coin of this realm, and also the said several pieces of foreign gold coin, do, for the reasons aforesaid, remain forfeited.” This judgment, on review, was held to be regular, after the court had ordered precedents to be searched. It thus appears that in revenue cases, as in admiralty, default entered establishes the facts averred in the libel or information as effectively as they can be established on hearing, and warrants a decree of condemnation if the information contains the necessary averments. The second assignment of error cannot, therefore, be sustained.
The third assignment is, that as the proceedings related *304 to seizure on land the ease was one of common law jurisdiction, and there should have been a trial by jury; and we are referred to Union Insurance Company v. United Slates,* Armstrong’s Foundry,† and other kindred cases. But in this cause there was a default. After the default there was no fact to be ascertained. The province of a jury in suits at common law is to decide issues of fact. "When there are no such issues there can be nothing for a jury to try. This assignment is, therefore, without merit. None of the cases cited go further than to hold that issues of fact, on the demand of either party, must be tried by jury.
. It remains to consider the objection urged on behalf of the plaintiff in error that the acts of Congress under which these proceedings to confiscate the stock have been taken are not warranted by the Constitution, and that they are in conflict with some'of its provisions. The' objection starts with the assumption that the purpose of the acts was to punish offences against the sovereignty of the United States, and that they are merely statutes against crimes. If this were a correct assumption, if the act of 1861, and the fifth, sixth, and seventh sections of the act of July 17, 1862, were municipal regulations only, there would be force in the objection that Congress has disregarded the restrictions of the fifth and sixth amendments of the Constitution. Those restrictions, so far as material to the argument, are, that no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or -indictment of a grand jury; that no person shall be deprived of his property without due process of law, and that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed. But if the assumption of the plaintiff' in error is not well made, if the statutes were not enacted under the municipal power of Congress to legislate for the punishment of crimes against the sovereignty of the United States, if, on the contrary, they are an exercise of *305 the war powers of the government, it is clear they are not affected by the restrictions imposed by the fifth and sixth amendments. This we understand to have been conceded in the argument. The question, therefore, is, whether the action of Congress was a legitimate exercise of the war power. The Constitution confers upon Congress expressly power to declare war, grant letters of marque- and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted. It therefore includes the right to seize and Confiscate all property of an enemy and to dispose of it at the will of the captor. This is and always has been an undoubted belligerent right. If there were any uncertainty respecting the existence of such a right it would be set at rest by the express grant of power to make rules respecting captures on land and water. It is argued that though there are no express constitutional restrictions upon the power of Congress to declare and prosecute war, or to make rules respecting captures on land and water, there are restrictions implied in the nature of the powers themselves. Hence it is said the power to prosecute war is only a power to prosecute it according to the law of nations, and a power to make rules respecting captures is a power to make such rules only as are within the laws of nations. Whether this is so or not we do not care to inquire, for it is not necessary to the present casé. It is sufficient that the right to confiscate the property of all public enemies is a conceded right. Now, what is that right, and why is it allowed? It may be remarked that it has no reference whatever to the personal guilt of the owner of confiscated property, and the act of confiscation is not a proceeding against him. The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to *306 appropriate the property.* In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy’s country, no matter what his nationality. The whole doctrine of confiscation is built upon the foundation that it is an instrument .of coercion, which, by depriving an enemy of property within reach of his power, whether within his territory or without it, impairs his ability to resist the confiscating government, while at the same time it furnishes to that government means for carrying oh the war. Hence any property which the enemy can use, either by actual appropriation or by the exercise of control over its owner, or which the adherents of the enemy have the power of devoting to the enemy’s use, is a proper subject of confiscation.
It is also to be observed that when the acts of 1861 and 1862 were passed, there was a state .of war existiug between the United States and the rebellious portions of the country. "Whether its beginning was on the 27th or the 30th of April, 1861, or whether it was not until the act of Congress of ¡July 13th of that year, is unimportant to this case, for both acts were passed after the existence of war was alike an actual and a recognized fact.† War existing, the United States were invested with belligerent rights in addition to the sovereign powers previously held. Congress had then full power to provide for the seizure and confiscation of any property which the enemy or adherents of the enemy could use for the purpose of maintaining the war against the government. It is true the war was not between two independent nations. But because a civil war, the government was not shorn of any of those rights that belong to belligerency. Mr. Wheaton, in his work on international law,‡ asserts the doctrine to be that “ the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other, and even as it respects neutral nations.” It would be absurd to hold that, *307 while in a foreign war enemy’s pi'operty may be captured and confiscated as a means of bringing the struggle to a successful completion, in a civil war of equal dimensions, requiring quite as urgently the employment of all means to weaken the belligerent in arms against the government, the right to confiscate the property that may strengthen such belligerent does not exist. There is no such distinction to be made. Every reason for the allowance of a right to confiscate in case of foreign wars exists in full force when the war is domestic or civil. It is, however, unnecessary to pursue this branch of the subject farther. In the Amy Warwick* and in the Prize Cases,† it was decided that in the war of the rebellion the United States sustained the double character of a belligerent and a sovereign, and had the rights of both.‡
We come, then, directly to the question whether the act of 1861, and the fifth, sixth, and seventh sections of the act of 1862 were an exercise of this war power, the power of confiscation, or whether they must be regarded as mere municipal regulations for the punishment of crime. The answer to this question must be found in the nature of the statutes and of the proceedings directed under them. In the case of Rose v. Himely,§ Chief Justice Marshall, in delivering the opinion of the court, said: “But admitting a sovereign, who is endeavoring to reduce his revolted subjects to obedience, to possess both sovereign and belligerent rights, and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If, as a legislator, he publishes a law ordaining punishment for certain offences, which law is to be applied by courts, the nature of the law and of the proceedings under it will decide whether it is an exercise of belligerent rights or exclusively of his sovereign power; and whether *308 the court, in applying this law to particular cases, acts as a prize court or as a court enforcing municipal regulations.”
.Apply this test to the present case.
It is hardly contended that the act of 1861 was enacted in virtue of the sovereign rights of the government. It defined no crime. It imposed no penalty. It declared nothing unlawful. It was aimed exclusively at the seizure and confiscation of property used, or intended to be used, to aid, abet, or promote the rebellion, then a war, or to maintain the war against the government. It treated the property as the guilty subject. It cannot be maintained that there is no power to seize property actually employed in furthering a war against the government, or intended to be thus employed. It is the act of 1862, the constitutionality of which has been principally assailed. That act had several purposes, as indicated in its title. As described, it was “An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.” The first four sections provided for the punishment of treason, inciting or engaging in rebellion or insurrection, pr giving aid and comfort thereto. They are aimed at individual offenders, and they were undoubtedly an exercise of the sovereign, not the belligerent rights of the government. But when we come to the fifth and the following sections we find another purpose avowed, not punishing treason and rebellion, as described in the title, but that other purpose, described in the title, as “ seizing and confiscating the property of rebels.” The language is, “ that to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States.” Then follows a description of six classes of persons, those referred to as the persons whose property should be liable to seizure. The sixth section describes still another class. Now, the avowed purpose of all this was, not to *309 reach any criminal personally, but “ to insure the speedy termination of the rebellion” then present, which was a war, which Congress had recognized as a war, and which this court has decided was then a war. The purpose avowed then was legitimate, such as Congress, in the situation of the country, might constitutionally entertain, and the provisions made to carry out the purpose, viz., confiscation, were legitimate, unless applied to others than enemies. It is argued, however, that the enactments were for the confiscation of property of rebels, designated as such, and that the law of nations allows confiscation only of enemy’s property. But the argument overlooks the fact that the rebellion then existing was a war. And, if so, those engaged in it were public enemies. The statute referred exclusively to the rebellion then in progress. "Whatever may be true in regard to a rebellion which does not rise to the magnitude of a war, it must be that when it has become a recognized war those who are engaged in it are to be regarded as enemies. And they are not the less such because they are also rebels. They are equally well designated as rebels or enemies. Regarded as deseriptio per sonar urn, the words “ rebels” and “enemies,” in such a state of things, are synonymous. And, if this is true, it is evident the statute, in denominating the war rebellion, and the persons whose property it attempts to confiscate rebels, may, at least, have intended to speak of a war and of public enemies. Were this all that could be said it would be enough, for when a statute will bear two constructions, one of which would be within the constitutional power of Congress to enforce, and the other a transgression of the power, that naust be adopted which is consistent with the Constitution. It is always a presumption that' the legislature acts within the scope of its authority. But there is much more in this case. It is impossible to read the entire act without observing a clear distinction between the first four sections, which look to the punishment of individual crime, and which were, therefore, enacted in virtue of the sovereign power, and the subsequent sections, which have in view a state of public war, and which direct *310 the seizure of the property of those who were iu fact enemies, for the support of the armies of the country. The ninth, tenth, and eleventh sections are iu this view significant. They declared that all slaves of persons engaged in rebellion against the government of the United States, or who should' in any way give aid and comfort thereto, escaping within our lines, or captured from such persons, or deserted by them, should be deemed captives of war, and forever free; that escaping slaves of such owners should not be delivered up, and that no person ■ engaged in the military or naval service should, under any pretence whatever, surrender slaves to claimants. The act then goes on to.provide for the employment of persons of African descent in the suppression of the rebellion. Can it be that all this was municipal legislation, that it had no reference to the war power of the government, that it ivas not an attempt to enforce belligerent rights? We do not think so. We are not to strain the construction of an act of Congress in order to hold it unconstitutional.
It has been argued, however, that the provisions of the act for confiscation are not confined in their operation to the property of enemies, but that they are applicable to the property of persons not enemies within the laws of nations. If by this is meant that they direct the seizure and confiscation of property not confiscable "under the laws of war, we cannot yield to it our assent. It may be conceded that the laws of war do not justify the seizure and confiscation of any private property except that of enemies. But who are to be regarded as enemies in a domestic or civil war ?■ In case of a foreign war all who are inhabitants of the enemy’s country, with rare exceptions, are enemies whose property is subject to confiscation; and it seems to have been taken for granted' in this case that only those who during the war were inhabitants of the Confederate States were liable to have their property confiscated. Such a proposition cannot be maintained. It is not true even in case of a foreign war. It is ever a presumption that inhabitants of an enemy’s territory are enemies, even though they are not participants in *311 the war, though they are subjects of neutral states, or eveu subjects or citizens of the government prosecuting the war against the state within which they reside. But even in foreign wars persons may be enemies who are not inhabitants of the enemy’s territory. The laws of nations nowhere declare the contrary. And it would be strange if they did, for those not inhabitants of a foreign state may be more potent and dangerous foes than if they were actually residents of that state. By uniting themselves to the cause of a foreign enemy they cast in their lot with his, and they, caunot be permitted to claim exemptions which the subjects of the enemy do not possess. Depriving them of their property is a blow against the hostile power quite as effective, and tending quite as directly to weaken the belligerent with whom they act, as would be confiscating the property of a non-combatant resident. Clearly, therefore, those must be considered as public enemies, and amenable to the laws of war as such, -who, though subjects of a state in amity with the United States, are in the service of a state at war with them, and this not because they are inhabitants of such a state, but because of their hostile acts in the war. Even under municipal law this doctrine is recognized. Thus in Vaughan’s Case* Lord Holt laid down the doctrines, “If the States (Dutch) be in alliance, and the French at war with us, and certain Dutchmen turn rebels to the States, and fight under the command of the French king, they are enemies to us, for-the French subjection makes them French subjects in respect of all nations but their own.” So, “ if au Englishman assist the French, and fight against the king of Spain, our ally, this is an adherence to the king’s enemies.”
Still less is it true that the laws of nations have defined who, in the ease of a civil war, are to be regarded and may be treated as enemies. Clearly, however, those must be considered such who, though subjects or citizens of the lawful government, are residents of the territory under the *312 power or control of the party resisting that government. Thus much may be gathered from the Prize Gases. And why are not all who act with that party? Have they not voluntarily subjected themselves to that party; identified themselves with it? And is it not as important to take from them the sinews of war, their property, as it is to confiscate the.property of rebel enemies resident within the rebel territory ? It is hard to conceive of any reason for confiscating the property of one class that does not equally justify confiscating the’ property of the other. We have already said that no recognized usage of nations excludes from the category of enemies those who act with, or aid or abet and give comfort to enemies, whether foreign or domestic, though they may not be residents of enemy’s territory. It is not without weight, that when the Constitution was formed its framers had fresh in view what had been done during the Revolutionary war. Similar statutes for the confiscation of property of domestic enemies, of those who adhered, to the British government, though not residents of Great Britain, were enacted in many of the States, and they have been judicially determined to have been justified by the laws of war. They show what was then understood to be confiscable property, and who were public enemies. At least they show the general understanding that aiders and abettors of the public enemy were themselves enemies, and hence that their property might lawfully be confiscated. It was with these facts fresh in memory, and with a full knowledge that such legislation had been common, almost •universal, that the Constitution was adopted. It did prohibit ex post facto laws. It did prohibit bills of attainder. They had also been passed by the States. But it imposed no restriction upon the power to prosecute war or confiscate enemy’s property. It seems to be a fair inference from the .omission that it was intended the government should have the power of carrying on war as it had been carried on .during the Revolution, and therefore should have the right to confiscate as enemy’s property, not only the property of foreign enemies, but also that of .domestic, and of the aiders, *313 abetters, and comforters of a public enemy. The framers of the Constitution guarded against excesses that had existed during the Revolutionary struggle. It is incredible that if such confiscations had not been contemplated as possible and legitimate, they would not have been expressly prohibited, or at least restricted. We are therefore of opinion, that neither the act of 1861 nor ¿that of 1862 is invalid, because other property than that of public enemies is directed to be confiscated. We do not understand the acts, or either of-them, to be applicable to any other than the property of enemies. All the classes of persons described in the fifth and sixth sections of the act of 1862 were enemies within the laws and usages of war.
It is further objected on behalf of the plaintiff in error, that under the statute of 1862 the property of all enemies was not made liable to confiscation. From this it is inferred, that whether persons were within the law or not depended not on their being enemies, but on certain overt criminal acts described and defined by the law. The fact asserted, namely, that all ‘enemies were not within the purview of the enactment we may admit, but we dissent from the inference. Plainly, it was competent for Congress to determine how far it would exert belligerent rights, and it is quite too large a deduction from the fact that the property only of certain classes of enemies was directed to be confiscated, that it was not intended to confiscate the property of enemies at all. If it be true that all the persons described in the fifth, sixth, and seventh sections were enemies, as we have endeavored to show, they were, it cannot matter by what name they were called, or how they were described. The express declaration of the seventh section was that their property should be condemned “ as enemies’ property,” and become the property of the United States, to be disposed of as the court should decree, the proceeds being' paid into the treasury for the purposes described, to wit, the support of the army. It ivas, therefore, as enemies’ property, and not as that of offenders against municipal law, that the statute directed its confiscation.
Upon the whole, then, we are of opinion the confiscation *314 acts are not unconstitutional, and we discover no error in the proceedings in this case.
Decree aeeirmed.

 Supra, 258.

 Scott v. Scholey, 8 East, 474.

 10 Wheaton, 492-3.

 By Hall, tit. 32, p. 70.

 Vide, also, Conklin’s Admiralty Practice, 478; Smith v. Miln, Abbott’s Admiralty, 373; and our Admiralty Rules, 2 and 37.

 Broome’s Legal Maxims, 428.

 14 Peters, 458.

 2 Howard, 339.

 7 Howard, 181.

 2d edition, § 452.

 § 454.

 1 Sprague, 399.

 Vol. i, chap. 1, Information in rem.

 Parker’s Reports of Revenue Cases, 57.

 Page 149.

 6 Wallace, 759.

 Ib. 766.

 The Venus, 8 Cranch, 253.

 Prize Cases, 2 Black, 635.

 § 296.

 2 Sprague, 123.

 2 Black, 673.

 Rose v. Himely, 4 Cranch, 272; Cherriot v. Foussat, 3 Binney, 252; Dobree v. Napier, 3 Scott, 225; Santissima Trinidad, 7 “Wheaton, 306; United States v. Palmer, 3 Wheaton, 635.

 4 Cranch, 272.

 2 Salkeld, 635.