**TATE, United States Treasurer, et al. v. ESCHER et al.**

Court of Appeals of District of Columbia.
Submitted May 7, 1929.   Decided
June 3, 1929.

No. 4777.

Thos. E. Rhodes, of Washington, D. C., for appellants.

Lawrence A. Baker, of Washington, D. C., and Spier Whitaker, of New York City, for appellees.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice.  A suit was brought in the Supreme Court of the District of Columbia December 8, 1921, by Jak. Robert Sigg-Fehr, Gottfried Rudolph Baumann-Kienast, and Edmund Gams, hereafter referred to as the plaintiffs, under section 9 of the Trading with the Enemy Act, as amended June 5, 1920, 41 Stat. 977 (50 USCA appendix § 9), to recover from the Treasurer of the United States and the Alien Property Custodian proceeds of the sale of 12,825 shares of the capital stock, together with accrued dividends, of the Locomotive Superheater Company, a Delaware corporation.  This property was seized by the Alien Property Custodian during the war as the property of the Schmidt'sche Heissdampf Gesellschaft, a German corporation.

After the suit was instituted, Jak. Robert Sigg-Fehr died, and Henry Escher was appointed ancillary administrator of his estate and substituted as plaintiff in his stead.  After protracted litigation it was adjudged that the plaintiffs were citizens of the Confederation of Switzerland and residents of the city of Zurich, and as such entitled to recover the property seized.  A decree was accordingly entered January 19, 1928, for the return to the plaintiffs of the proceeds from the sale of the stock, amounting to $2,565,000, with accumulated earnings thereon.  This was subsequently paid to the plaintiffs by the Alien Property Custodian and the Treasurer, with a deduction of $55,909.83 for administrative expenses.

The present action is on a rule to show cause why the amount so deducted should not be paid over to the plaintiffs, and from a decree directing such payment the Alien Property Custodian and the Treasurer have appealed.

Under section 6 of the Trading with the Enemy Act, 40 Stat. 415 (50 USCA appendix § 6), the President was authorized to appoint an Alien Property Custodian and to employ "and fix the compensation of such clerks, attorneys, investigators, accountants, and other employees as he may

find necessary for the due administration of the provisions of this act.''

By authority of the act an executive order was issued on July 16, 1918, which, among other things, provides: ''All costs and expenses incurred by reason of or in respect of, and all claims and demands of every kind, character and description based upon or arising out of, the custody, management, administration, protection, preservation and control of any such property, and the conduct or other operation of any such going business or other undertaking and the sale or other disposition of any such property, shall be limited to and paid or satisfied out of only the property or business or undertaking involved and out of which, on account of which, or in respect of which such cost, expenses, claim or demand shall have been incurred and shall have arisen or been created; provided that whenever such property or the income therefrom or the assets of any such going business or other undertaking shall be insufficient therefor, such cost, expenses, claim or demand shall be charged thereto, but may be paid or satisfied out of money or other property received from, or as the property of, the same enemy.''

By the Act of March 4, 1923, § 2, 42 Stat. 1511 (50 USCA appendix § 24), the Alien Property Custodian was authorized to pay the taxes assessed against property held by him and the necessary expenses incurred by him or any depository for him in securing the possession, collection, or control of money or other property seized by him or in protecting or administering the same out of the funds so seized.

Section 12 of the Trading with the Enemy Act, as amended March 28, 1918, 40 Stat. 459 (50 USCA appendix § 12), provides: ''The Alien Property Custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be, or which has been or shall be required to be, conveyed, transferred, assigned, delivered, or paid over to him in pursuance of the provisions of this act, and, in addition thereto, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof by sale or otherwise, and exercise any

rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof.''

Recognizing the duties and authority thus conferred upon the Alien Property Custodian, Congress in the Act of May 16, 1928, 45 Stat. 574, making appropriations for the executive office and executive bureaus, boards, commissions, etc., provided: ''All expenses of the office of the Alien Property Custodian authorized by the act entitled 'An act to define, regulate, and punish trading with the enemy, and for other purposes,' approved October 6, 1917, as amended, including compensation of the Alien Property Custodian at not to exceed $10,000 per annum; shall be paid from interest and collections on trust funds and other properties under the control of such Custodian.''

It will thus be observed that it was the policy of Congress and the Executive Department, through its orders, to require the payment of the costs of administration under the Alien Property Act to be deducted from the funds administered. We are of opinion that the contention of the plaintiffs that this rule should not be applied to property that was afterwards found to have been wrongfully seized is without merit.

If the seizure and detention of the property can be sustained as a justifiable circumstance of war, the conditions imposed for its return may be charged with such reasonable restrictions as may be deemed proper. Clearly the expense of executing the trust, declared by law to exist in the Alien Property Custodian, even as to property which has been ultimately found to have been seized by mistake, cannot be said to be so unfair and unreasonable as to fall within the condemnation of equity. No charge of fraud or arbitrary conduct is here made against the officials of the government. Every reason obtained for believing the property seized to be enemy owned, and the determination of the question of whether or not it was properly or improperly seized was one for the courts, which in this instance, as in many others, meant extended litigation.

Congress and the President were here exercising a war power, employed to cripple the enemy in the conduct of hostilities in such manner as to operate beneficially to the United States and their allies. At such times, in dealing with a public

enemy, statutory and constitutional limitations affecting property rights have little force. It is sufficient to warrant the seizure, detention, and even the confiscation of enemy-owned property that the owner or the reputed owner be a resident of the enemy's country. In Miller v. United States, 11 Wall. 268, 305 (20 L. Ed. 135), the court, construing the Civil War Acts of Congress of August 6, 1861 (12 Stat. 319), and July 17, 1862 (12 Stat. 589), known as the Captured and Abandoned Property Acts, said:

"The question, therefore, is, whether the action of Congress was a legitimate exercise of the war power. The Constitution confers upon Congress expressly power to declare war, grant letters of marque and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted. It therefore includes the right to seize and confiscate all property of an enemy and to dispose of it at the will of the captor. This is and always has been an undoubted belligerent right. If there were any uncertainty respecting the existence of such a right it would be set at rest by the express grant of power to make rules respecting captures on land and water. It is argued that though there are no express constitutional restrictions upon the power of Congress to declare and prosecute war, or to make rules respecting captures on land and water, there are restrictions implied in the nature of the powers themselves. Hence it is said the power to prosecute war is only a power to prosecute it according to the law of nations, and a power to make rules respecting captures is a power to make such rules only as are within the laws of nations. Whether this is so or not we do not care to inquire, for it is not necessary to the present case. It is sufficient that the right to confiscate the property of all public enemies is a conceded right.

"Now, what is that right, and why is it allowed? It may be remarked that it has no reference whatever to the personal guilt of the owner of confiscated property, and the act of confiscation is not a proceeding against him. The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership.

It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to appropriate the property. In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy's country, no matter what his nationality. The whole doctrine of confiscation is built upon the foundation that it is an instrument of coercion, which, by depriving an enemy of property within reach of his power whether within his territory or without it impairs his ability to resist the confiscating government while at the same time it furnishes to that government means for carrying on the war. Hence any property which the enemy can use either by actual appropriation or by the exercise of control over its owner, or which the adherents of the enemy have the power of devoting to the enemy's use, is a proper subject of confiscation."

This statement of the law is but a epitome of the sanction that the courts have always placed upon the power of Congress in time of war to authorize the seizure, through executive channels, of property not only enemy-owned, but of property believed to be enemy-owned, providing always that there is adequate provision made for the return of property seized by mistake. ■ It further appears in this case that from the promulgation of the Executive Order of February 26, 1918, down to the present time the uniform practice has been indulged by the Custodian, approved by the Comptroller, of deducting from the several trusts administered sufficient amount to cover the administrative expenses incident thereto. The construction thus given by the officers charged with the duty of execution will not be lightly considered by the courts or overruled without impelling reasons. United States v. Moore, 95 U. S. 760, 24 L. Ed. 588; Brown v. United States, 113 U. S. 568, 5 S. Ct. 648, 28 L. Ed. 1079; United States v. Johnston, 124 U. S. 236, 8 S. Ct. 446, 31 L. Ed. 389; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269. In corroboration of this view, the Act of March 4, 1923 (50 USCA appendix § 24), authorizing the Custodian "to pay the necessary expenses incurred by him or by any depository for him in securing the possession, collection, or control of any such money or other property, or in protecting or administering the

same," amounts to congressional confirmation of the practice theretofore existing to the effect that from each trust a sum sufficient to pay the expenses of collecting, protecting, and administering the same shall be deducted. It must be assumed that Congress was familiar with its own acts, as well as the executive orders in force, and the long-continued and consistent practice of the department in administering the affairs pertaining to the seizure, retention, control, and ultimate return of alien property. Possessing this information, the conclusion is irresistible that it was intended by the late Act of May 16, 1928 (45 Stat. 573, 574), to approve and confirm the procedure thus established.

We think it not unreasonable, in the light of the legislation, the executive orders, and the war power of Congress, to sustain a policy which imposes upon the property, though ultimately found to have been mistakenly seized, the expense incurred in protecting, disposing of, or investing it. This is but the application of a general rule of civil procedure in connection with the administration of trusts. 2 Perry on Trusts and Trustees (6th Ed.) § 910; Trustees v. Greenough, 105 U. S. 527, 532, 26 L. Ed. 1157; Woodruff v. New York, etc., R. Co., 129 N. Y. 27, 29 N. E. 251.

The decree is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.