## UNITED STATES v. STEINEL.

### No. 7919.

District Court, D. Connecticut.

Dec. 31, 1946.

Adrian W. Maher, U. S. Atty., and Thomas J. Birmingham, Asst. U. S. Atty., Dist. of Conn., both of Hartford, Conn., for plaintiff.

Rowland Watts, of Baltimore, Md., for defendant.

SMITH, District Judge.

The defendant is a conscientious objector charged with violation of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 301 et seq., by leaving and refusing to return to a Civilian Public Service camp to which he had been assigned.

By motion to dismiss the defendant attacks the constitutionality of the Act as applied to the conscientious objectors as well as the application of the Act to his case at the time of his alleged crime. He urges at this time the arguments of unlawful delegation of power, deprivation of private property without compensation, and the imposition of an unconstitutional condition (service in the Civilian Public Service camps without compensation) upon a privilege (deferment from military service). He also urges that the Act, if constitutional, no longer required service of him at the time of the alleged crime for two reasons: one, that the twelve-months period limited in the original Act had not been extended by the Service Extension Acts, 50 U.S.C.A.Appendix, § 351 et seq., and had expired long prior to his leaving the camp; two, that the entire Act had expired so far as it applied to any duty of further service either active military training and service or civilian public service, since the provisions of the termination clause in the Extension Acts had been met by the termination of hostilities in the then present war either by the Presidential proclamation of victory over Japan or by the actual termination of armed conflict and the recognition by the Executive of such termination.

■ The first three grounds have been advanced in numerous cases and have been uniformly, or almost so, decided against the contentions of the defendant. In this Circuit the constitutionality of the Act as it relates to the Civilian Public Service camps for conscientious objectors appears to be settled by the Brooks and Zucker cases. Brooks v. United States, 2 Cir., 1945, 147 F.2d 134. United States ex rel

Zucker v. Osborne, 2 Cir., 1945, 147 F.2d 135 and cases cited.

It may be, however, that the questions of the effect on the conscientious objector of the wording of the Service Extension Acts and the effect of the termination of the organized resistance of the enemy prior to V-J Day have not been fully considered in this Circuit.

The defendant contends that he was under no duty to remain in work of national importance under civilian direction for more than twelve months. He argues that the Act of 1940 provides for one year's training and service and that the various extensions of the Act purported to extend only the periods of military training and service and not work of national importance under civilian direction.

■ It is true that the Extension Acts refer only to military training and service in lengthening the twelve-months period. They do so, however, because only military training and service was subject to the original twelve-months limitation. The limitation on the other provisions of the Act, including work of national importance under civilian direction, is to be found in Section 16(b) providing that except for the reserve, discharge, and pay provisions, the Act should become inoperative on and after May 15, 1945 except as to offenses committed prior to that time, unless continued in effect by the Congress. The Act was continued in effect by the Congress until May 15, 1946 (59 Stat. 166, Act of May 9, 1945) "or the date of the termination of hostilities in the present war," defined in the statute to be the date proclaimed by the President or specified in a concurrent resolution.

The arguments advanced concerning the expiration of the twelve-months period ignore the history and general purpose of the Act. It was not a permanent, peacetime, military training plan. It was enacted at a time when grave danger faced the nation, the spreading war in Europe and Asia and the existence of the Berlin-Rome-Tokyo axis threatening the survival of free nations anywhere on the globe. To meet that emergency the Act was drawn, to provide for the raising and

968

training of armed forces for the defense of the nation in the particular crisis then apparent. When trained, individuals were to be held available for actual military service in case of need under the reserve provisions of the Act. The length of the needed military training period to fit the men for possible future active service was much in dispute. The twelve-months period was reached by compromise as that time needed to train a civilian to be a soldier, available on call to enter active warfare. It is obvious from the provisions of the Act, taken as a whole, that it was contemplated that all limitations on training and service should be removed or extended in case of war or in case the Congress should decide that the international situation had worsened sufficiently to imperil the national interest. The limitation was never intended to be a limitation on the length of liability to active military service in the crisis facing the nation. It was never contemplated that in time of war we would return to the system of short periods of service which had cost the nation so much in human suffering and material waste in the wars prior to 1917.

█ The draft of conscientious objectors for civilian work was primarily to assist in the functioning of the military draft by removing a possible haven for draft evaders and by protecting the morale of the military draftee; secondarily, it was to provide against interruption of work of national importance by the movement of the best of our manpower into military service. Both purposes are served by the requirement of work of national importance from the conscientious objector during the time limited for the operation of the Act. The twelve-months limitation applied to the training period of the military draftee has no purpose as applied to the conscientious objector. The provisions requiring assignment of conscientious objectors to work of national importance under civilian direction were to be effective during the period when the military draft was to be in operation, that is, during the life of the Act, some four and one-half years, if not sooner terminated. They are the obvious results of compromise as to method between points of view of the advocates of the system said

to be in favor in Great Britain of complete deferment or exemption of those conscientiously opposed to participation in the war effort in any manner, and the point of view of the advocates of military service of at least non-combatant nature for all whose occupation or dependents did not justify deferment or exemption from military service for the greater efficiency of the total war effort. They were not the result, however, of any compromise as to time, within the full period of the emergency contemplated by the Act.

█ We may quarrel with the judgment of the majority of the Congress as to the most effective method of handling the conscientious-objector problem. Our disagreement with that judgment, however, does not empower us to set aside the provisions of the Act if they are reasonably adapted to the end sought and within the power of the Congress under the Constitution. As to that there can be no room for dispute. The war powers, the powers to raise and support armies and to provide and maintain a navy, are constitutional grants as broad as they need be to allow the Congress to provide for the successful defense of the nation and its institutions.

"From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, 'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that

term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." United States v. MacIntosh, 1931, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 574, 75 L.Ed. 1302.

"The war power of the national government is 'the power to wage war successfully'. See Charles Evans Hughes, War Powers Under the Constitution, 42 A.B.A. Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war. Prize Cases, supra [2 Black 635, 17 L.Ed. 459]; Miller v. United States, 11 Wall. 268, 303-314, 20 L.Ed. 135; Stewart v. Kahn, 11 Wall. 493, 506, 507, 20 L.Ed. 176; Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Am.Cas.1918B, 856; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668; United States v. MacIntosh, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 574, 75 L.Ed. 1302. Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Ex parte Quirin, supra, 317 U.S. 28, 29, 63 S.Ct. 10, 11, 87 L.Ed. 3; cf. Prize Cases, supra, 2 Black 670, 17 L.Ed. 459, Martin v. Mott, 12 Wheat. 19, 29, 6 L.Ed. 537. Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgement for theirs." Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774.

At the time of the alleged offense, March 2, 1946, the date of May 15, 1946 had not been reached, nor had a concurrent resolution proclaimed the end of hostilities, nor does the question arise in this case whether the joint resolution of May 14, 1946 or the Act of June 29, 1946 were effective to continue the Selective Training and Service Act of 1940 in operation, for the original Act as amended by 59 Stat. 166 was in effect at the time of the alleged violation, and prosecution could be had under it even though the Act had become in other respects inoperative.

It is true that the Congress has set the terminal date of the Act as that of the termination of hostilities. It has left little to interpretation, however, in the definition of that term. The courts must find that either the President has fixed the date by proclamation or the Congress by concurrent resolution. The Congress was careful to retain the power of terminating the operation of the Act without the necessity of Presidential concurrence in its determination at any time of no further need for the Act, although willing to allow the President to bring the functioning of the Act to a close if he should find that the need had ended before the Congress should act. It is an unusual provision which might raise some question, if a concurrent resolution were adopted, as to whether it could constitutionally be effective since it is without the President's signature. That question, however, we do not reach, for no such resolution has been passed by the Congress and the Presidential proclamation on which the defendant relies was obviously not intended to decide the question of the termination of hostilities within the meaning of this Act.

The motion to dismiss is denied.