MILLER, Alien Property Custodian, v. KALIWERKE ASCHERSLEBEN AKTIEN–GESELLSCHAFT et al.,
and three other cases.

(Circuit Court of Appeals, Second Circuit. May 22, 1922.)

Nos. 284–287.

1. War ⊜—12—Decree for Alien Property Custodian in proceedings under Trading with Enemy Act did not settle property rights finally.

In proceedings by Alien Property Custodian for seizure of property of alien enemy under Trading with the Enemy Act, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i), a decree for the Alien Property Custodian did not settle property rights finally, but merely gave him such custody of the property as would have been gained by seizure, and merely attached the property, to make sure that it was forthcoming, if finally condemned.

2. Corporations ⊜—111½, New, vol. 16A Key-No. Series—Trading with Enemy Act held to override the Uniform Stock Transfer Law of state of New York, in so far as they conflict.

Trading with the Enemy Act, as amended (Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), authorizing the Alien Property Custodian to require new certificates of corporate stock owned by alien enemies to be issued to him under certain circumstances, *held* to override the Uniform Stock Transfer Law of the state of New York (Personal Property Law, § 174), relating to the issuance of new stock certificates, in so far as the two are in conflict.

3. War ⊜—12—British Public Trustee's claim in alien property not determined in Alien Property Custodian's proceeding for seizure; "person."

In proceedings by Alien Property Custodian for seizure of the property of an alien enemy, under Trading with the Enemy Act, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i), refusal to pass on claims asserted in the property by the British Public Trustee, *held* proper, since the trustee's remedy for the determination of such claims was under section 9 as amended by Act July 11, 1919, § 1, and Act June 5, 1920, in view of section 7 (c), as amended by Act Nov. 4, 1918 (Comp. St. Ann. Supp. 1919, § 3115½d), specifying the remedy of any "person" having any claim; the

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

British trustee being a "person" within such statute, notwithstanding Const. art. 3, and Act April 30, 1790, § 25 (Comp. St. § 7611).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Person.]

4. War ⬿12—Alien Property Custodian held authorized to seize corporate stock standing on books of corporation in name of alien enemy.

Under Trading with the Enemy Act, § 7 (c), as amended by Act Nov. 4, 1918 (Comp. St. Ann. Supp. 1919, § 3115½d), providing for seizure by the Alien Property Custodian of "any money or other property, including * * * choses in action and rights and claims of every character and description owing or belonging to or held for, by, or on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder," and in view of subdivision (a), the Alien Property Custodian was entitled to seize corporate stock standing on the books of an American corporation in the name of an enemy.

5. War ⬿12—Situs of stock for purposes of seizure by Alien Property Custodian was in state which created corporation and in which it resided.

The situs of corporate stock, for the purpose of seizure by the Alien Property Custodian under the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), was in the state which created the corporation, and in which it resided, notwithstanding the location of the stock certificates, since a share of stock and the certificate of the share are two different things; the certificate being mere evidence of the stockholder's interest as distinguished from the stock itself.

6. Corporations ⬿94—Certificate of stock mere evidence of stockholder's interest in corporation, as distinguished from stock itself.

The certificate of stock is not the stock itself, but merely evidence of the stockholder's interest in the corporation.

7. War ⬿12—Alien Property Custodian perfected seizure of corporate stock by notice on corporation that he seized all rights of persons specified in notice and required them to be transferred to himself.

The Alien Property Custodian perfected a seizure of corporate stock of an alien enemy by service of notice on the corporation which had issued the stock that he seized all the rights, privileges, and beneficial interests therein held by the persons specified in the notice, and required the same to be transferred to himself.

8. War ⬿12—Alien Property Custodian held entitled to issuance of new certificates of alien enemy's stock without surrendering outstanding certificates.

The Alien Property Custodian, in seizing corporate stock of alien enemy under the Trading with the Enemy Act, could require the corporation to issue certificates to him without presenting for cancellation the outstanding certificates under Act Oct. 6, 1917, § 12 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), and section 7 (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d).

9. War ⬿12—Government may confiscate corporate stock of alien enemy.

The government is entitled to confiscate the corporate stock of an alien enemy.

10. Constitutional law ⬿278(1)—War ⬿12—Provision of Trading with the Enemy Act for issuance of certificates to Alien Property Custodian without surrender of outstanding certificates held not denial of due process.

Trading with the Enemy Act Oct. 6, 1917, § 12 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff) and section 7 (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), requiring a corporation on demand of the Alien Property Custodian, to issue certificates of stock of alien enemy to Alien Property Custodian without requiring Custodian to surrender outstanding certificates, held constitutional as against the contention that nonenemy bona fide holders of outstanding certificates could be deprived of their property in violation of the due

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

process clause of the Constitution; the rights of such nonenemy bona fide holders being protected by section 9 as amended by Act July 11, 1919, § 1, and Act June 5, 1920.

Appeals from the District Court of the United States for the Southern District of New York.

Libels by Thomas W. Miller, as Alien Property Custodian, for seizure under the Trading with the Enemy Act of certain rights, privileges, and beneficial interests granted to and created in favor of the Kaliwerke Aschersleben Aktien-Gesellschaft, Dr. Wilhelm Bayer, Maj. Von Poser, and Gross Nedlitz, by virtue of their participation in a voting trust with respect to the stock of the International Agricultural Corporation, etc. (Thomas W. Lamont and others, as voting trustees, claimants), and for seizure of certain shares of the capital stock of the International Agricultural Corporation (Max Winter, claimant). Decrees for libelant (Garvan v. Certain Shares of International Agricultural Corporation, etc., 276 Fed. 206), and claimants appeal. Affirmed.

The Alien Property Custodian instituted these proceedings under the Act of Congress approved October 6, 1917, known as the "Trading with the Enemy Act," and the amendments thereto (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), and the executive orders and proclamations issued thereunder. The proceedings were in the nature of libels of information against certain rights in the International Agricultural Corporation, a New York corporation. The proceedings were heard together in the court below, and were there disposed of in a single opinion. On the appeal they were heard together in this court, and they are disposed of here in a single opinion.

The proceedings were commenced in May, 1919, by the service of process, libel petitions. and orders of service. After the coming in of the claims, and filing of the answers of the various claimants, a motion was made by the Custodian, on April 8, 1920, for a decree on the pleadings. On January 31, 1921, an opinion was rendered directing decrees for the libelant. and on June 29, 1921, the decrees were entered. The libels in all four proceedings are based upon section 17 of the Trading with the Enemy Act. 40 Stat. c. 106, p. 425 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i). That section authorizes the District Courts of the United States to enter such orders and decrees and to issue such process as may be necessary and proper to enforce the provisions of the act.

The property proceeded against in the first three proceedings above entitled consists of the interests in the International Agricultural Corporation evidenced by voting trust certificates issued by Thomas W. Lamont, Waldemar Schmidtmann, William N. Shaw, John W. Fry, and J. Du Pratt White, appellants herein. On September 14, 1909, a voting trust agreement was made between certain stockholders of the corporation and the appellants above named as voting trustees, wherein the stockholders agreed to deposit with the trustees their shares and the certificates therefor, with sufficient transfers thereof in favor of the trustees, and to receive or have delivered in exchange therefor voting trust certificates, and it was agreed that such deposit should continue for a period of five years, or until September 14, 1914, unless sooner terminated as therein provided.

The voting trust agreement contained, among other provisions, the following: "During said period of five years the trustees shall possess and are entitled to exercise all rights of every name and nature, including the right to vote in respect of any and all such shares so deposited." And: "Fifth. On September 14, 1914, the trustees, in exchange for, and upon surrender of any of the voting trust certificates then outstanding, duly indorsed, will, in accordance with the terms hereof, cause to be delivered proper certificates of equivalent amount of stock of said International Agricultural Corporation, either common or preferred, as called for by the voting trust certificates surrendered, and may require holders of voting trust certificates to exchange them for

certificates of stock of the class and in the amounts called for by such voting trust certificates."

The voting trust certificates contained among other provisions, the following: "The certificate is transferable only on the books which shall be kept for the purpose by said voting trustees at the office of said International Agricultural Corporation by the registered holder hereof, either in person or by attorney, duly authorized according to the rules which shall be established for that purpose by said trustees, and on surrender hereof, and until so transferred, said trustees may treat the registered holder as owner hereof for all purposes whatever, except the delivery of certificates hereunder shall not be made without the surrender hereof."

The shares of stock standing in the names of the persons mentioned in the titles to the first three proceedings were deposited under this voting trust agreement, and voting trust certificates for a corresponding number of shares issued by the voting trustees in the names of such former stockholders. The situation at the time of the commencement of these proceedings was that there were single certificates in the names of the voting trustees, respectively, for 24,568 shares of preferred stock and for 13,213 shares of common stock, against which the voting trustees had issued voting trust certificates divided according to the former interests of the stockholders making the deposit. It appears that the corporation and the voting trustees, in accordance with the requirements of the Trading with the Enemy Act, sent to the Alien Property Custodian the information required with respect to such of the stockholders and voting trust certificate holders of record, whom they respectively had reasonable cause to believe alien enemies.

Thereafter, the Alien Property Custodian having determined that the persons named in the titles to these proceedings were alien enemies not holding a license from the President, made several demands that the property held for them be transferred, assigned, delivered, and paid over to him as Custodian, as required by the Trading with the Enemy Act. The demands were served upon the voting trustees, the Bankers' Trust Company, as agent for the voting trustees, and as transfer agent for the International Agricultural Corporation, upon the First National Bank of New York, registrar of the International Agricultural Corporation, and upon the last-named corporation itself.

The demand not having been complied with, the Custodian filed his libel petition in the District Court, in which he asked the court to make and enter an order directing the marshal of the Southern district of New York forthwith to seize and take possession of the money and other property described in the libel and hold the same until the further order of the court. He also asked the court to make and enter an order requiring and citing all persons having or pretending to have any claim to the possession of the said money or other property to appear and show cause why the possession of said money and other property should not be delivered to him, to be by him held, administered, and accounted for in accordance with the provisions of the Trading with the Enemy Act.

Thereupon the court entered an order in each of the proceedings, in which the marshal was directed forthwith to seize and take into his possession the property described in the libels. It was also ordered that all persons having or pretending to have any claim to possession of the property, or any part thereof, should appear at the time and place named and show cause why the possession of the property should not be delivered by the marshal to the libelant, to be held by him and administered and accounted for according to law.

As the statement thus far made relates to the first three of the proceedings above entitled and now under consideration, and in which the interests in the corporation are evidenced by voting trust certificates, it remains to point out that in the fourth and last of the proceedings now before us the voting trust is not involved, and the voting trustees are not appellants—the sole appellant being the International Agricultural Corporation.

In the first proceeding (being No. 326) the property demanded by the libel consists of the interests created in favor of Kaliwerke Aschersleben Aktien-Gesellschaft, by virtue of its participation in the voting trust with respect to the stock of the International Agricultural Corporation, and represented by

the voting trust certificates registered and standing upon the books or records of the voting trustees in the name of the Kaliwerke Aschersleben Aktien-Gesellschaft, and numbered as specified below:

| Certificate No. | Shares. | Class of Shares. |
|---|---|---|
| A–787/89 | 3,750 | First preferred |
| 671/3 | 3,750 | Common |

In the second proceeding (being No. 327) the property demanded consists of the interests created in favor of Dr. Wilhelm Bayer, by virtue of his participation in the same voting trust, and represented by voting trust certificates registered and standing upon the books or records of the voting trustees in Bayer's name, and numbered and specified as follows:

| Certificate No. | Shares. | Class of Shares. |
|---|---|---|
| 764 | 102 | First preferred |
| A–761 | 148 | First preferred |

In the third proceeding (being No. 328) the property demanded consists of the interests created in favor of Major Von Poser und Gross Nedlitz, by virtue of his participation in the same voting trust, and represented by voting trust certificates registered and standing upon the books or records of the voting trustees in the name of Von Poser und Gross Nedlitz, and numbered and specified as follows:

| Certificate No. | Shares. | Class of Shares. |
|---|---|---|
| A–1108 | 69 | First preferred |
| B–452/3 | 200 | Common |

In each of the above-named proceedings the demand in the libel is for the certificates, together with all dividends on such shares, and obligations arising from the payment of corporate dividends, as more particularly specified in said voting trust agreement, and profits and accumulations thereon.

In the fourth of the above proceedings (being No. 396) the property demanded consists of certain shares of the capital stock of "International Agricultural Corporation, a New York corporation, heretofore registered and standing upon the books of said corporation in the name of Max Winter, and represented by certificate No. 1999, for 52 shares of first preferred stock."

In each of the cases the court, after due argument, granted a decree to the Alien Property Custodian upon the pleadings. In each of the cases certain claims were filed by persons claiming an interest in the subject-matter of the suit. The court below declined to adjudicate with respect to these claims.

Hughes, Rounds, Schurman & Dwight, of New York City (Charles E. Hughes, Jr., of New York City, of counsel), for appellants.

William Hayward, U. S. Atty., of New York City (Dean Hill Stanley, Sp. Asst. Atty. Gen., of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). From what has been said it appears that these are libels, brought by the Alien Property Custodian under the Trading with the Enemy Act and its amendments, to obtain the possession of certain rights, privileges and beneficial interests in a New York corporation and evidenced by certain certificates of stock and voting trust certificates alleged to belong to certain alien enemies. The court below having granted the relief sought by the Custodian, and required the corporation to issue new certificates without any surrender of the old, the proceedings have been brought into this court by appeal.

[1] In the consideration of the questions presented it will be well to keep in mind that the decrees which have been entered in the court be-

low in these proceedings simply give into the possession of the Custodian the property which he had previously seized by making his demand in accordance with the terms of the Trading with the Enemy Act. The decrees do not settle any property rights finally. As declared in Central Trust Co. v. Garvan, 254 U. S. 554, 569, 41 Sup. Ct. 214, 216 (65 L. Ed. 403) they give "nothing but the preliminary custody, such as would have been gained by seizure." They attach "the property, to make sure that it is forthcoming, if finally condemned, and do no more."

[2] The International Agricultural Corporation, which issued the stock certificates, we have seen, is a New York corporation, and as such is ordinarily subject to the laws of the state of New York. The Uniform Stock Transfer Law of that state declares that:

"Except where a certificate is lost or destroyed, such corporation shall not be compelled to issue a new certificate for the stock until the old certificate is surrendered to it." New York Personal Property Law (Consol. Laws, c. 41) § 174.

But under the Trading with the Enemy Act, as amended, and which Congress has passed in the exercise of its war powers, the Alien Property Custodian is authorized to require new certificates to be issued to him under certain circumstances, and unless for some reason these acts of Congress are unconstitutional they override the law of the state of New York in so far as the two are in conflict.

In Miller v. United States, 11 Wall. 268, 20 L. Ed. 135, decided at the December term, 1870, the Supreme Court sustained the right of the government to confiscate stocks in a railroad corporation, which stock was alleged to belong to one Miller, a citizen of Virginia, who held various offices under the government of the Confederate States. The seizure was made under the Acts of Congress of August 6, 1861 (12 Stat. 319), and July 17, 1862 (12 Stat. 589). It was claimed in that case that the acts of Congress above referred to violated the Fifth and the Sixth Amendments to the Constitution. The court, in sustaining the constitutionality of the legislation, held that the statutes were not enacted under the municipal power of Congress or of its sovereignty, but under the war powers, and as such were not affected by the restrictions imposed by the amendments, and they were held to be a legitimate exercise of the war power. And it was admitted by Mr. Justice Field in his dissenting opinion, concurred in by Mr. Justice Clifford, that:

"The war powers of the government have no express limitation in the Constitution, and the only limitation to which their exercise is subject is the law of nations."

The seizure of the stock consisted in a notice given by the United States marshal to the president of one of the companies and to the vice president of the other that he seized the stock. The certificates of stock were not seized and were presumed to be in the possession of the owner of the stock. See the dissenting opinion of Mr. Justice Davis, 11 Wall. 329, 20 L. Ed. 135.

The preliminary statement of facts which precedes the opinion in that case shows that the old certificates were outstanding, but the corporations were nevertheless directed to cancel the old certificates and to issue new certificates to the purchasers of the stock at a sale under a de-

cree which had been entered condemning and forfeiting the property to the United States and ordering it to be sold. The Supreme Court held the Confiscation Acts of 1861 and 1862 valid, and affirmed the decree of the court below.

In Stoehr v. Wallace, 255 U. S. 239, 242, 41 Sup. Ct. 293, 65 L. Ed. 604, the Trading with the Enemy Act, whether taken as originally enacted or as since amended, was upheld as valid, being "strictly a war measure," and finding its sanction in the power given to Congress by the Constitution "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water."

This court had the Trading with the Enemy Act before it recently in the Matter of Miller, 281 Fed. 764, decided at this term. In that case we decided that the demands made by the Custodian for the surrender to him of property which he had determined to be the property of an alien enemy effected an immediate seizure of the property demanded, and that the Custodian was entitled through the District Court to enforce the rights which he acquired by the seizure which he effected at the time of his demand. We held, too, that, when the District Court is asked to enforce the rights which the Custodian has acquired by such seizure, the District Court is without jurisdiction in that proceeding to determine any adverse claims in the property demanded, and that such claims must be determined thereafter in a separate suit to be brought under the provisions of section 9 of the act. We said that:

"Any and all questions concerning any interest claimed by third persons in the property seized or demanded by the Custodian are to be raised and determined as provided by section 9 of the Trading with the Enemy Act, and not in the proceeding now before the court."

This statement was intended to be as comprehensive and all-inclusive as we could make it, and would seem to dispose of the question now raised as to the rights of certain claimants which the court below declined to pass upon. The Act of November 4, 1918, 40 Stat. c. 201, p. 1021, which amended subsection (c) of section 7 of the Trading with the Enemy Act (Comp. St. Ann. Supp. 1919, § 3115½d), provided that:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this act. * * * "

In two of the proceedings now before the court, being No. 326 and No. 328, the British Public Trustee, acting as custodian of enemy property in Great Britain, pursuant to certain acts of the Parliament of the United Kingdom of Great Britain and Ireland, filed claims and interposed answers, in which he alleged his seizure of the voting trust certificates assigned in blank and the vesting of the property in him by vesting orders made by the Board of Trade, a department of the British government, prior to any of the demands made by the Alien Property Custodian; that by virtue of such seizure he "became vested with the ownership of said voting trust certificates and with the beneficial interest in the stock of said International Agricultural Corporation, * * * as if the said voting trust certificates had been then and there duly conveyed and transferred" to him by the alleged enemies involved.

He therefore prayed that the court should determine and decree that he was the owner of the property which was the subject of these two proceedings, and was entitled to possession thereof, and upon surrender of the voting trust certificates was entitled to the issues of stock certificates in his name.

The voting trustees took the position that they were not concerned with these conflicting claims, but that their only interest was that whatever decree should be made should adequately protect them against double liability. They therefore urged the court to make a complete trial of the question of ownership and decrees which would be res judicata against the claimants and the Alien Property Custodian. This, as heretofore stated, the court expressly refused to do, deciding simply that new and unqualified certificates must be issued to the Alien Property Custodian.

[3] One of the questions we are now required to determine, therefore, is whether the court below erred in declining in these proceedings to pass upon the claims of the British Public Trustee. It is clear that no error was committed, if the British Public Trustee must be regarded as "any person," within the provision of subsection (c) of section 7 above quoted. If he must be so regarded, then no error was committed, and he must proceed under section 9 of the act. It is granted that the Public Trustee represents the sovereignty of the British nation as respects property which he claims under the acts of Parliament conferring upon him rights in alien property found within the United Kingdom. But if he undertakes to assert those rights in the courts of the United States, he certainly must proceed in accordance with the laws of the United States. When the statute says that "the sole relief and remedy of any person" is that provided in the act, no court is authorized to make an exception in favor of any person, even though he be the sovereign of a friendly and allied nation. Indeed, no suggestion that the court can ingraft such an exception upon the statute can be found in the comprehensive brief submitted to us by the counsel for the appellants.

We are not aware that any reason can be suggested in support of such a theory. Diplomatic agents of a foreign sovereign who are accredited to this nation are not subject to the operation of the laws of the United States or to the jurisdiction of our courts. Article 3 of the Constitution extends the jurisdiction of the federal courts to all cases affecting ambassadors, ministers, and consuls, and it provides that the Supreme Court may exercise original jurisdiction in all cases affecting ambassadors, ministers, and consuls. And Congress by the Act of April 30, 1790 (1 Stat. 117, § 25 [Comp. St. § 7611]), has declared void any writ or process sued out in any court of the United States or of a state against any public minister, or any domestic or domestic servant of such minister. But it always has been the law that if a person, so exempt from process, sues in any court of the United States, he must proceed in the regular way and in accordance with the laws of the jurisdiction invoked. The principle is equally applicable to the British Public Trustee.

[4] The property which is involved in these proceedings consists of certain shares of stock evidenced in the first three of the above-entitled

283 F.—48

proceedings by voting trust certificates, and in the last-entitled proceeding by the ordinary stock certificates. And it is necessary to consider whether the Trading with the Enemy Act, and the amendatory acts, authorize the Custodian to seize corporate stock standing on the books of an American corporation in the name of an enemy; and, if he is so authorized, then we must consider whether the Custodian perfected a seizure of the stock herein involved.

That portion of the Act of October 6, 1917, relevant to the matter is found in subdivision (c) of section 7 as amended by the Act of November 4, 1918, which is set forth in the margin.[1] The property which subdivision (c) requires to be delivered over to the Custodian, and which it is provided that he may seize is:

"Any money or other property including  *  *  *  choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy

---

[1] "(c) If the President shall so require any money or other property including (but not thereby limiting the generality of the above) patents, copyrights, applications therefor, and rights to apply for the same, trade-marks, choses in action and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing, or so belongs, or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian; and all property thus acquired shall be held administered and disposed of as elsewhere provided in this act.

"Any requirement made pursuant to this act, or a duly certified copy thereof, may be filed, registered, or recorded in any office for the filing, registering or recording of conveyances, transfers, or assignments of any such property or rights as may be covered by such requirement (including the proper office for filing registering, or recording conveyances, transfers, or assignments of patents, copyrights, trade-marks or any rights therein or any other rights); and if so filed registered, or recorded shall impart the same notice and have the same force and effect as a duly executed conveyance, transfer, or assignment to the Alien Property Custodian so filed, registered, or recorded.

"Whenever any such property shall consist of shares of stock or other beneficial interest in any corporation, association, or company or trust, it shall be the duty of the corporation, association, or company or trustee or trustees issuing such shares or any certificates or other instruments representing the same or any other beneficial interest to cancel upon its, his, or their books all shares of stock or other beneficial interest standing upon its, his, or their books in the name of any person or persons, or held for, on account of, or on behalf of, or for the benefit of any person or persons who shall have been determined by the President after investigation, to be an enemy or ally of enemy, and which shall have been required to be conveyed, transferred, assigned or delivered to the Alien Property Custodian or seized by him, and in lieu thereof to issue certificates or other instruments for such shares or other beneficial interests to the Alien Property Custodian or otherwise, as the Alien Property Custodian shall require.

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States."

or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing, or so belongs, or is so held, shall be conveyed.  *  *  * "

In view of the express provisions of the act, no doubt can be entertained concerning the intention to make enemy-owned stock the subject of seizure. This intention of Congress is also indicated in the provisions of subdivision (a) of section 7, which required every corporation incorporated within the United States to transmit to the Custodian a full list, duly sworn to, of every stockholder known to be, or whom the representative of the corporation has reasonable cause to believe to be, an enemy resident within the territory, or a subject or citizen, residing outside of the United States, of any nation with which the United States is at war, or resident within the territory, or a subject or citizen residing outside of the United States, or any ally of any nation with which the United States is at war, together with the amount of stock or shares owned by each such officer, director, or stockholder, or in which he has any interest. We think it, therefore, undeniable that the Custodian was authorized to deal with such stock in the same manner as he was authorized to deal with any other kind of enemy-owned property.

In Stoehr v. Wallace, supra, the Custodian, acting under the Trading with the Enemy Act, had seized 14,900 shares of the capital stock of the Botany Worsted Mills, a New Jersey corporation, which stock was alleged to be the property of a German corporation. The right of the Custodian to seize the stock owned by an alien enemy, and, having been seized, to dispose of it by sale or otherwise as if he were the absolute owner, save as the power of disposal may be suspended by a suit under section 9, seems to have been given full recognition in the above case.

Assuming, as we must, that the act gave the Custodian the power to seize the stock, it becomes important to inquire whether the method he adopted to effect the seizure was a valid and effective one.

[5, 6] It may be observed that, shares of stock being intangible, incorporeal, personal property, their situs for purposes of seizure is in the state which creates the corporation and where it resides. The situs of the shares involved in these proceedings was in the Southern district of New York, that being the residence of the corporation which issued them. A share of stock and the certificate of the share are two very different matters. The certificate of stock is not the stock itself, but mere evidence of the stockholder's interest in the corporation. A seizure of the certificate, which may be in one state or country, is not a seizure of the stock, the situs of which may be in another. That the situs of the stock is at the domicile of the corporation, and that it makes no difference that the certificate of the stock may physically be elsewhere, is the rule in the federal courts. See Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 20 Sup. Ct. 559, 44 L. Ed. 647, in which the court said:

"The certificates are only evidence of the ownership of the shares, and the interest represented by the shares is held by the company for the benefit of the true owner. As the habitation or domicile of a company is and must be in the state that created it, the property represented by its certificates of

stock may be deemed to be held by the company within the state whose creature it is, whenever it is sought by suit to determine who is its real owner."

In the proceedings under review the demand, and therefore the seizure of the stock, having been made within the Southern district of New York, which was the domicile of the corporation as well as the domicile of the voting trustees, was an effective seizure of the stock, and it is quite immaterial, so far as the mere fact of seizure is concerned, whether the certificates were or were not in the possession of the British Public Trustee.

[7, 8] Before concluding the consideration of the method of seizure adopted by the Custodian, which in these proceedings consisted, as we have seen, in giving notice to the corporation and its agents and to the voting trustees of the stock that he seized all the right, title, and beneficial interest with respect to the stock of the parties specified in the notice, together with the dividends and obligations arising from the payment of dividends, and demanded that the old certificates should be canceled and new ones issued to himself, we must determine the sufficiency of notice as effecting seizure, and the further fact that the demand was for the cancellation of the old certificates and the issuance of new ones without the surrender of the old.

In considering this phase of the subject it is only necessary to refer to Miller v. United States, 11 Wall. 268, 296, 297, 20 L. Ed. 135. That case arose under the Confiscation Act of July 17, 1862, and it involved the seizure of corporate stock. The act of 1862 gave no directions respecting the mode of seizure but simply authorized seizure to be made. The corporations which issued the stock were Michigan corporations, and under the law of Michigan there was no provision authorizing the taking of stocks on mesne process. The United States attorney directed the marshal to seize the shares of Miller, and to leave a copy of the seizure certified by him with the clerk, treasurer, or cashier of the companies, or with such person as at the time had custody of the books and papers of the corporation. The return showed that the marshal seized the stock by serving a notice of seizure upon the vice president of one of the companies and upon the president of the other. The question thus raised was whether this notice, and there appears to have been nothing more, constituted a sufficient seizure. We think that a careful examination of the facts shows that the certificates of stock were not themselves taken, nor in the possession of any one concerned in the proceedings, but were outstanding. It was claimed that there had been no seizure, and that the sale which followed was of no effect. But the court held otherwise, and that the mere notice which was given was in itself a sufficient seizure of the stock. That decision was followed in Alexandria v. Fairfax, 95 U. S. 774, 778, 24 L. Ed. 583. And see Phoenix Bank v. Risley, 111 U. S. 125, 130, 4 Sup. Ct. 322, 28 L. Ed. 374.

The decrees appealed from require a cancellation of the old certificates and the issuance of new certificates, without there being any surrender of the old certificates; and this is relied upon as error. It appears that the Act of October 6, 1917, in section 12, made it the duty of every corporation incorporated within the United States, and every·

unincorporated association, or company, or trustee, or trustees issuing shares or certificates representing beneficial interests, to transfer such shares or certificates upon its, his, or their books into the name of the Alien Property Custodian upon demand, "accompanied by the presentation of the certificates which represent such shares or beneficial interests." 40 Stat. c. 106, p. 423 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff).

But the Amendatory Act of November 4, 1918, dispensed with the necessity of the presentation of the outstanding certificates of stock as a condition precedent to the issuance of new certificates in lieu of the old and outstanding certificates. 40 Stat. c. 201, p. 1021. This change in the law was not due to an accident, but appears to have been intentionally done. See Garvan v. Marconi Wireless Telegraph Co. (D. C.) 275 Fed. 486, 489; Garvan v. Certain Shares of International Agricultural Corporation (D. C.) 276 Fed. 206.

It is said that the appellants would be liable to a bona fide transferee, other than an alien enemy, of these stock and voting trust certificates, if they are compelled to issue new certificates without surrender and cancellation of the outstanding old certificates; and we are told that, except where a certificate is lost or destroyed, a corporation cannot be compelled to issue a new certificate until the old certificate is surrendered to it.

It may be conceded that, if a corporation issues a certificate of stock, the general rule is that, so long as it is outstanding, it is a continuing affirmation that the person named therein is the owner of the number of shares specified therein and has a right to transfer the same, and that the corporation is estopped to deny the holder's right to make such transfer as against a bona fide purchaser; and it is settled that in this matter a voting trust certificate and a stock certificate do not differ. Union Trust Co. v. Oliver, 214 N. Y. 517, 108 N. E. 809. It is to be observed, however, that Congress, in the Trading with the Enemy Act, has specifically legislated on this subject, and by the provisions of subsection (e) of section 7 of the Act of October 6, 1917, protected the appellants against any liability which might otherwise exist, if they are compelled to issue new certificates to the Custodian without the surrender of the old. Subsection (e) declares:

"(e) No person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this act. '

"Any payment, conveyance, transfer, assignment, or delivery of money or property made to the alien property custodian hereunder shall be a full acquitance and discharge for all purposes of the obligation of the person making the same to the extent of same. * * *"

[9, 10] But the question remains as to the rights of the bona fide holder of the outstanding certificates. As respects the enemy bona fide holder we need not inquire inasmuch as the government is plainly entitled to confiscate his interest. The nonenemy bona fide holder, however, cannot be deprived of his property except by due process of law; and unless the acts of Congress have made ample provision for the protection of his rights the proceeding must fail. An examination of

the Trading with the Enemy Act as amended shows that the fullest protection is accorded to the nonenemy bona fide holder of the certificates. Provision was made in section 9 of the Act of October 6, 1917, for the protection of any person, not an enemy or ally of an enemy, claiming any interest, right, or title in any property delivered to the Custodian or seized by him. Section 9 of the original act was amended by the Act of July 11, 1919, 41 Stat. c. 6, p. 35, and by the Act of June 5, 1920, c. 241, 41 Stat. p. 977. It is not necessary to set out in detail herein the provisions of section 9. It suffices to say that an examination of those provisions shows that they afford full protection to any one not an enemy or the ally of an enemy to assert his right or interest in any property which the Custodian takes into his possession. The provision made for the protection of the rights of every claimant is ample and provides due process of law.

As was declared by the Supreme Court in Stoehr v. Wallace, supra, the Trading with the Enemy Act as amended distinctly reserves to any claimant a right to assert and establish his claim by a suit. And in the assertion of his claim he is unembarrassed by the precedent executive determination that the property belongs to any enemy alien, or by the decree of the District Court giving effect to the Custodian's seizure and requiring the transfer of the property into his possession. If the property seized happens to be stocks, the claimant's right to reclaim the stocks is in no way prejudiced or embarrassed by the fact that the old certificates have been canceled and new ones issued without the old ones having been returned. In Stoehr v. Wallace, supra, the court said:

"That the shares were transferred to the Custodian's name does not affect the question, for, considering the nature of the property, that was but an incident of an effective seizure, and, if a return of the shares were ordered, a retransfer would follow as of course."

And we may point out that in Miller v. United States, supra, the Supreme Court affirmed a decree which directed the sale of stock which had been seized under the act of 1862, although the old certificates remained outstanding. The corporations, in that case, under the decree of sale, were directed to cancel the old certificates and to issue new certificates to the purchasers at the sale.

We may summarize the conclusions at which we have arrived as follows:

1. Trading with the Enemy Act and the act amendatory thereof authorize the Alien Property Custodian to seize corporate stock standing on the books of an American corporation in the name of an alien enemy.

2. The Custodian perfected a seizure of the stock involved in these proceedings by service of notice upon the corporation which had issued the stock that he seized all the rights, privileges, and beneficial interests therein held by the persons specified in the said notice, and required the same to be transferred to himself.

3. The Custodian is authorized, under the Trading with the Enemy Act and the acts amendatory thereof, to require the issuance to him of certificates for stock owned by an alien enemy and seized by him, and this he can require to be done without the presentation for cancellation of the outstanding certificates.

4. The Trading with the Enemy Act and the acts amendatory thereof do not involve a violation of the Constitution, and in requiring the issuance of new certificates of stock to the Custodian without a surrender of the outstanding certificates Congress has made ample provision in section 9 for the protection of constitutional rights, and one entitled thereunder to assert such rights is not deprived of his property without due process of law.

5. There was no error committed by the District Court in these proceedings, which were brought by the Custodian for the single purpose of perfecting his seizure and obtaining the possession of the property which he demanded and had previously determined to belong to an alien enemy, in refusing to pass upon claims asserted in the property involved, including the claim of the British Public Trustee. The sole remedy for the determination of claims to such property is provided under section 9. They cannot be determined in a proceeding under section 17, which is the section under which these proceedings were brought.

The decrees are affirmed.