*983 OPINION.
Arundell:
The issue that runs through all the years before us in these proceedings is that of whether amounts' paid to petitioner’s stockholders, who were also employees, are deductible in full as reasonable allowances for salaries. From 1922 on through 1925 petitioner paid its stockholder-employees certain salaries plus bonuses designated in the minutes of directors’ meetings as “ additional compensation.” Beginning with 1926 the bonus system was discontinued and thereafter the stockholders were paid flat amounts approximately equal to the total of salaries and bonuses previously paid. The bonuses paid in the earlier period were not distributed according to individual efforts or results, but were based on petitioner’s gross sales and allocated according to predetermined percentages. The respondent allowed as deductions the basic salaries paid, and disallowed the bonuses on the theory, that they were distributions of earnings and not ordinary and necessary business expenses. In the later period, 1926 to 1930, the respondent allowed as salary deductions amounts equal to, and in some cases substantially more than, the amounts he determined represented deductible salaries in the earlier years. The respondent having made a determination that the amounts claimed by petitioner are excessive, the burden is on petitioner to show that the amounts involved are but reasonable compensation for the services rendered and are no more than ordinary and necessary expenses of conducting its business. Botany Worsted Mills v. United States, 278 U.S. 282. In L. Schepp Co., 25 B.T.A. 419, 429, we said:
When the Commissioner has made a determination, the taxpayer who attacks it must prove by evidence of the services rendered and their value that a correct determination would exceed that of the Commissioner. Where the payments are to kinsfolk or to shareholders, the proof must also show that they were not influenced by family considerations and were not disguised distributions of profits.
In Becker Bros. v. United States, 7 Fed. (2d) 3, in discussing the question of reasonableness of salaries, the court said:
There can be no doubt that the corporation was entitled to deduct from the income it received all the ordinary and necessary expenses incurred in carrying on its business, including a reasonable compensation to its officers and *984 employees. But the salaries which are paid in order to constitute an allowable deduction must be a reasonable and fair compensation for the services rendered. The expenses which can be deducted aré the “ ordinary and necessary expenses.” If a corporation sees fit to pay its employees extraordinary, unusual, and extravagant salaries, distributing the profits of the business in the guise of salaries to its officers, who hold the stock and control its affairs, such salaries manifestly do not constitute the “ ordinary and necessary expenses ” of the business, which can be deducted under the statute. The government is not bound or concluded either by any resolution which the corporation adopts, or by its method of beeping books, upon the question as to whether any particular payment is a salary payment or a division of surplus.
Examining the documentary evidence, a close relationship between stock ownership and the distribution of the so-called bonuses at once appears. The several stockholder-employees, the percentages of Doernbecher’s stock for which they were to pay under the contract of December 1, 1920, and the percentages of bonus distributions were as follows:
[[Image here]]
While the distributions based on petitioner’s gross sales were not exactly in the same ratio as stock ownership, the two are sufficiently close to raise a most strong presumption that there was a direct connection between them. Although there was the variation between percentage of stock ownership and that of distribution as set out above, the amounts distributed, with but insignificant variations, were in direct proportion to stockholdings. Thus in 1922 and 1923 F. A. Tauscher,- owning twice as much stock as P. J. Lychywek and Conrad Tauscher, received twice the amount distributed that they did. C. E. Dye and E. S. Beach each owned twice the amount of stock owned by F. A. Tauscher and each received double the amount paid to Tauscher, H. A. Green and B. P. John in all the years 1922 to 1925 received the same amounts as “ bonuses ”, there being a difference of one share in amount of stock issued to them at December 1, 1920, and their stockholdings being equal after December 19, 1928. In 1924 and 1925 the same situation obtained, with differences of but a few cents. Thus in 1924 F. A. Tauscher, with twice the stock of Lychywek, received in distribution $3,093.75 and Lychywek $1,546.90. *985 Based on stock, Tauscher should have received 5 cents more. In the same year Beach and Dye, with twice the stock of Tauscher, were paid twice as much as Tauscher as bonuses. In 1925 Beach and Dye each received the same amount, $6,416.54, which was slightly more than twice Tauscher’s $3,203.46, and this latter sum was not quite double Lychywek’s $1,606.52. Moreover, comparing the basic salaries and the bonuses, a further relationship between stockholdings and bonuses is apparent. It may be presumed that the basic salary is some indication of the directors’ judgment of the worth of the employee to the business. Here we find employees with substantially different basic salaries, but having contracted to purchase the same amounts of stock, receiving the same amounts as bonuses. Beach with a basic salary of $8,500 from 1922 to 1924 and $9,374.97 in 1925, and Dye with a basic salary of $12,000 in all these years, each contracted to buy the same amount of stock, and each received the same distribution every year. Conrad Tauscher’s basic salary was $3,600 in 1922 and 1923 and that of Lychywek was $4,000. Each contracted to purchase the same amount of stock and received equal amounts in distribution. With these figures before us the conclusion is inescapable that the annual distributions designated as bonuses were in fact distributions .of profits to stockholders and were not salaries paid for services rendered.
For the purpose of this phase of the case we think that the several employees who contracted to purchase Doernbecher’s stock on December 1, 1920, should be considered to be stockholders throughout the entire period, although stock was not issued in their names until in December 1923. All of them were parties to the contract of purchase and all eventually received their stock.
Beginning with 1926 the distribution of bonuses was discontinued and the amounts paid to stockholder-employees were thereafter designated as salaries. The principal stockholders, Green and John, thereafter were paid $75,000 each, which was but $278.46 less than the total received by each in 1925. The other stockholders all received more after 1925, the increases from 1925 to 1926 being as follows: Beach, $2,708.49; Dye, $183.46; F. A. Tauscher, $196.54; Lychywek, $1,043.46. No reason is given for the change from salary plus bonus system to the straight salary method of compensation. It is apparent, however, that none of the stockholders suffered any decrease, except Green and John in comparatively small amounts, in the annual sums received, and which in the prior years we have held represented in part distributions of profits to stockholders. In each of the years involved the respondent has allowed deductions of substantial amounts as compensation to these employees for services rendered, and the evidence does not convince us that the amounts so allowed were not reasonable sums.
*986 The petitioner offered the testimony of witnesses to establish what amounts would constitute reasonable salaries for Green and John. These- witnesses were experienced in the wholesale and retail furniture business and knew something of some of the manufacturing concerns. However, they did not know what salaries were paid by manufacturers to the men who occupied the positions similar to those of Green and John, and we are not convinced that they had sufficient familiarity with the manufacture of furniture to be able to give an opinion of what constituted reasonable salaries sufficiently reliable to form the basis for a finding of fact. The evidence abundantly establishes that the several stockholders performed valuable services for petitioner, that each was skilled in his field of duty, and that they all served petitioner loyally and whole-heartedly. But it does not establish to our satisfaction that they were entitled to any greater sums than allowed by the respondent as reasonable compensation. We accordingly sustain the respondent on the salary issue for all years.
The item of $9,902.58 paid by petitioner in 1929 as its share of the expenses of investigating the possibilities of a proposed merger of furniture concerns in our opinion should be allowed as an expense deduction in that year. It appears that the respondent’s only reason for disallowance is that some of the information gathered in that investigation was availed of by companies entering into another merger in 1930. The evidence is that petitioner was not a party to the 1930 merger. Its nearest approach to participating was that in 1930 a newly organized corporation which took over the assets of a number of companies purchased petitioner’s stock from its stockholders. As far as petitioner was concerned the proposed merger in connection with which it incurred expenses was abandoned in 1929 and it is entitled to the deduction claimed.
The remaining question is that of affiliation in the year 1930 with the Furniture Corporation of America, Ltd., hereinafter called the Furniture Corporation. The facts, in brief, are that on June 26,1930, Green, Beach, and Dye assigned all their stock except qualifying directors’ shares to the Furniture Corporation, expressly subject to the contract of July 18, 1927, between Green, Beach, Dye, Tauscher, and Lychywek, on the one side, and John on the other. Under that contract all of the stock which Green, Beach, and Dye assigned to the Furniture Corporation was placed in escrow with the United States National Bank at Portland as collateral security to guarantee the performance of the contract under which the petitioner had contracted to purchase John’s stock. The.contract with John gave him the right to foreclose on the stock in case of default, but it was provided that until he did foreclose, “ this agreement shall not in any way or manner affect the rights of the first parties to vote their *987 respective stock hereby pledged as collateral.” The assignors attempted to deliver the stock to the assignee on October 1, 1930, hut John refused to release it from escrow. The petitioner filed a consolidated return with the Furniture Corporation for the period June 26 to December 31,1930. The respondent allowed affiliation and determined income on a consolidated basis from October 1 to December 31, 1930, and refused to allow affiliation prior to October 1.
The respondent’s position now is that there was no statutory affiliation at any time in the year 1930.
The assignment of June 26,1930, in our opinion was effective as of that date to transfer ownership to the Furniture Corporation of 10,844% shares of stock. The prior pledge agreement of the assignors with John did not deprive them of title and ownership. Where there exists the requisite statutory ownership, affiliation is not denied because the stock has been pledged, Lavenstein Corp. v. Commissioner, 25 Fed. (2d) 375, or leased, including the right to the lessee to vote the stock, Connecticut & Passumpsic Rivers R.R. Co., 24 B.T.A. 394. But there is still the question of whether the 10,847½ shares of Green, Beach, and Dye constituted all the outstanding stock at June 26, 1930, or whether the 8,135% shares standing in the name of John and held in escrow throughout 1930 should also be considered to be outstanding stock.
Petitioner’s view is that the contract with John was a contract of purchase and sale and that John’s stock thereupon became treasury stock, leaving only the 10,847% shares of Green, Beach, and Dye as outstanding stock in 1930. We think it unnecessary to decide whether the agreement with John was a contract of sale vesting title presently in the petitioner, or a contract to sell under which John retained title until payment was completed. In either event the 8,135% shares which were the subject of the contract continued to be outstanding stock throughout 1930. If title passed to the corporation upon execution of the contract, the stock again becaihe outstanding when it was deposited with the bank as collateral security for performance of the terms of the contract. If title remained in John the stock clearly was outstanding. By the same token that stock pledged or leased was taken into consideration in determining the matter of affiliation in the cases above cited, John’s block of stock must be treated as outstanding stock here. It cannot be ignored or treated as nonexistent. “ Stock once issued is and remains outstanding until retired and canceled by the method provided by statute for the retirement and cancellation of capital stock.” Commissioner v. Woods Machine Co., 57 Fed. (2d) 635, quoting Knickerbocker Improvement Co. v. Board of Assessors, 65 Atl. 913. No action is shown to have been taken by petitioner to retire and cancel the John block of stock. The statute requires direct ownership of *988 at least 95 percent “ of the stock ” in order to constitute an affiliation. It follows from, what we have said that the John block of 8,135% shares must be considered as part “ of the stock ” of petitioner. As that block was not owned by the Furniture Corporation at any time during 1930, there was no affiliation in that year, and the respondent erred, as he now claims, in allowing affiliation for a part of the year.

Decision will he entered under Rule 50.