**KANSAS, O. & G. RY. CO. v. HELVERING,**
Commissioner of Internal Revenue.

No. 7726.

Circuit Court of Appeals, Third Circuit.

Dec. 24, 1941.

Wm. R. Spofford, of Philadelphia, Pa. (Charles S. Jacobs, Frank C. Hendryx, and Ballard, Spahr, Andrews & Ingersoll, all of Philadelphia, Pa., on the brief), for petitioner.

S. Dee Hanson, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Helen R. Carloss, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The Commissioner of Internal Revenue assessed income tax deficiencies against the petitioner for the years 1932, 1933, 1934 and 1935 on the ground that its taxable income for the years specified had been unwarrantedly included and accounted for in consolidated returns filed by the Muskogee Company, a Delaware corporation, whose assets throughout each of the years in question consisted principally of stock of a number of corporations (including the petitioner[1]), engaged in the business of common carrier by railroad. The Commissioner based his action on the conclusion that the Muskogee Company did not own the percentage of the petitioner's voting stock required by the applicable Revenue Acts of 1932 and 1934, governing the inclusion of a subsidiary's income in its parent's consolidated return.

Section 141(a) and (d) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, pages 532, 533, permitted the filing of a consolidated return by an affiliated group of domestic corporations if "At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations;" etc. The term "stock", as therein used, "does not include non-voting stock which is limited and preferred as to dividends". Section 141(a) and (d) of the 1934 Act contains similar provision, 26 U.S.C.A. Int.Rev.Acts, pages 715–717, but limits the privilege of filing consolidated returns to corporations whose business, either directly or through stock ownership, is exclusively that of a common carrier by railroad.

The Board of Tax Appeals approved the Commissioner's separate assessments against the petitioner and the question here is whether the Board erred in concluding that the Muskogee Company did not own the requisite percentage of the petitioner's voting stock for consolidated return purposes. There is no dispute as to how much of the petitioner's voting stock Muskogee owned. The difference between the parties arises in determining what legally constituted the petitioner's outstanding stock or, in other words, the basis upon which the percentage of Muskogee's stock ownership is to be figured. Review of the Board's action necessitates a recital of the facts which, as stipulated by the parties and as competently found by the Board, show the following.

Kansas, Oklahoma & Gulf Railway Company, the petitioner, was incorporated in

---

[1] The petitioner also owned the whole of the capital stock of the Kansas, Oklahoma & Gulf Railway of Texas which, by reason of this affiliation with the petitioner, was likewise included in the Muskogee Company's consolidated returns. However, the matter is of no present importance to the question of Muskogee's right to include the petitioner's income in its returns. Furthermore, the Kansas, Oklahoma & Gulf Railway of Texas (the petitioner's subsidiary) had neither net income nor loss for the period from 1932 to 1935, both inclusive.

462

1919 under the laws of Oklahoma to take over the property and assets of a railway system in effectuation of a plan of reorganization known as the "Hook Plan". Pursuant to the plan, all of the preferred and common stock of the petitioner was placed in a voting trust and stock trust receipts in bearer form were issued therefor to the persons entitled to the stock. The plan was also fully carried out in its other details.

In 1924, a receiver was appointed for the petitioner's properties and a decree of foreclosure was entered. In order to preclude a foreclosure sale, a further plan of capital readjustment for the petitioner was promulgated on January 2, 1926, subject to the Interstate Commerce Commission's approval of the stock surrender therein provided for. The Muskogee Company then owned most of the trust receipts for the preferred stock of the petitioner, all of the trust receipts for its common stock, and, in addition, most of the three series of mortgage bonds which had been issued by the petitioner in accordance with the plan. In short, Muskogee owned almost ninety-eight per cent. of the trust receipts for the petitioner's entire capital stock, all of which had voting privileges.

Under the readjustment plan, which was put into effect, Muskogee surrendered for cancellation its trust receipts for the whole of the petitioner's common stock and a major portion of its trust receipts for the preferred stock. Most of the serial bonds of the petitioner, including those owned by Muskogee, were exchanged, pursuant to the readjustment plan, for new series A, B and C preferred stock. As a result of the readjustment, the petitioner's outstanding stock after 1926 consisted of series A, B and C preferred stock and the residue of the old preferred for which the trust receipts were still extant. All of these stocks had the same par value and the same voting privileges.

In July 1931, the stock voting trust under the "Hook Plan" was terminated. Notice of the termination with a request for the surrender of the trust receipts was mailed to all holders thereof for whom the trustees had addresses. Not unnaturally, the list of addresses was not wholly complete. Registration or notice of trust receipt transfers had not been required, as the receipts ran in favor of the bearer. Furthermore, many of the trust receipts were held by persons abroad, some of whom were unknown. By the end of 1931, trust receipts for 25,820 shares of the non-serial preferred stock (out of a total of outstanding receipts for 27,000 shares) were surrendered and the shares of stock were issued therefor. Receipts for the remaining shares not having been surrendered, a stock certificate for the 1,180 unclaimed shares was issued to and registered in the name of "C. Jared Ingersoll, Agent", on December 28, 1931. In accepting this stock certificate, Ingersoll, who had been a trustee of the stock voting trust under the "Hook Plan", acted in the belief that he was an agent for the Railway Company of which he was also an executive officer. In March of 1933 Ingersoll came to the conclusion that he was without right to hold the 1,180 unclaimed shares in any capacity and thereupon returned to the company for cancellation the certificate which he had held as agent. At that time the unclaimed shares were 1,162, trust receipts for 18 shares having been surrendered in the meantime by the holders, who received the equivalent shares in exchange. The company cancelled the Ingersoll certificate on its books as of December 31, 1932, and at the same time made a journal entry transferring $116,200 (the par value of the 1,162 unclaimed shares) of the Railway Company's liability for non-serial preferred stock to an account designated "Stock Liability for Conversion-Preferred Stock". Shortly thereafter (early 1933) trust receipts for 25 shares more were surrendered by the holders to whom the shares were then issued. Thereupon the non-serial preferred stock account was accordingly credited with $2,500 (the par value of the 25 shares) and a corresponding debit in like amount was made in the reserve account for "Stock Liability for Conversion-Preferred Stock". Since then the accounts have been so carried on the books of the Railway Company without any further change therein, no additional trust receipts for unclaimed shares having been surrendered.

It is the petitioner's contention that the shares represented by the unsurrendered trust receipts are not outstanding stock and will not be until stock certificates therefor have been issued to the holders upon surrender of the trust receipts. This, the petitioner urges, is likely never to occur in view of the trustees' past experience after diligent effort to locate the holders of the receipts. If the petitioner's view be adopted and the 1,137 shares are not counted in determining the extent of the petitioner's out-

standing voting stock, concededly Muskogee owned more than ninety-five per centum of such stock. On the other hand, the Commissioner maintains that the 1,137 trust shares are an integral part of the petitioner's outstanding stock. If such is the case, then Muskogee's ownership, admittedly, was ninety-four and forty-one one-hundredths per centum of the whole of the outstanding stock and consequently less than the required percentage.

The attending circumstances make the question one of special concern to the petitioner and its parent corporation. During each of the years in question, the petitioner had a relatively large net income for which its tax liability, if assessed separately, is substantial, whereas, if the petitioner's income for the critical years be included in Muskogee's consolidated returns, it is entirely off-set by the net losses which all of the other affiliated corporations included in the consolidated returns suffered during the same years. Undoubtedly, a certain equity underlies the taxpayer's claim. Its parent voluntarily surrendered for cancellation a large portion of its voting stock holdings in order to prevent a foreclosure sale which would have wiped out the interests of all of the trust receipt holders, a decree foreclosing the mortgage securing the petitioner's bonds having already been entered. But equity needs be unaffecting when the duty present is to apply the specific prescription of a plainly worded provision in a tax statute.

The Board of Tax Appeals found that "The shares represented by undeposited stock trust receipts were authorized and issued stock of the petitioner and that stock has never been retired." While this finding is one of mixed law and fact, in so far as it reflects fact as to what was or was not done, it is in strict accord with the evidence, and in so far as it reflects the legal significance of the facts, it is also correct. The Board's further conclusion that the stock represented by the unsurrendered trust receipts was outstanding follows as a matter of law from the original stock issuance and its non-retirement thereafter. Doernbecher Mfg. Co. v. Commissioner, 30 B.T.A. 973, 987, affirmed 9 Cir., 80 F.2d 573. Cf. Commissioner v. S. A. Woods Mach. Co., 1 Cir., 57 F.2d 635; Goldstein-Fineberg Co. v. State Board of Assessors, 83 N.J.L. 61, 83 A. 773; Knickerbocker Importation Co. v. State Board of Assessors, 74 N.J.L. 583,

65 A. 913, 7 L.R.A.,N.S., 885; Collateral Equities Trust v. Commissioner, 39 B.T.A. 834.

■ The fact that stock certificates have never been issued to the holders of the unsurrendered trust receipts, upon which the petitioner's effort to differentiate is so largely based, fails to signify that the stock is not outstanding. As was said by the Supreme Court in Richardson v. Shaw, 209 U.S. 365, 378, 28 S.Ct. 512, 516, 52 L. Ed. 835, 14 Ann.Cas. 981, "the certificate of shares of stock is not the property itself, it is but the evidence of property in the shares." See, also, Eisner v. Macomber, 252 U.S. 189, 208, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, and Miller v. Kaliwerke Aschersleben Aktien-Gesellschaft, 2 Cir., 283 F. 746, 755. The legal relation of a stockholder to his corporation and his proprietary interest therein "are quite independent of the certificate of ownership, which is mere evidence of title. The complete fact of title [to stock] may very well exist without it [a stock certificate]." Cecil National Bank v. Watsontown Bank, 105 U. S. 217, 222, 26 L.Ed. 1039. It may therefore be stated as a corollary that the existence of outstanding stock does not depend on the issuance of a certificate for the shares thereof. Cf. Pacific National Bank v. Eaton, 141 U.S. 227, 233, 11 S.Ct. 984, 35 L.Ed. 702; Mau v. Montana Pac. Oil Co., 16 Del. Ch. 114, 141 A. 828, 831; United States Radiator Corporation v. State, 208 N.Y. 144, 101 N.E. 783, 785, 46 L.R.A.,N.S., 585; Smith v. Universal Service Motors Co., 17 Del.Ch. 58, 147 A. 247, 248; Keystone Wrapping Machine Company v. Bromeier, 42 Pa.Super. 384, 387.

The right of the holders of the stock trust receipts to the stock covered thereby is an established fact in this case. Thus, the stipulation recites that the Commissioner in determining the percentage of petitioner's stock owned by Muskogee Company "has included as 'outstanding stock' * * * [the] *shares of preferred stock to which the holders of stock trust receipts, which have not as yet been deposited, are entitled.*" (Emphasis supplied.) Being so entitled, the holders of the stock trust receipts are the owners of the stock, even though no stock certificates have been issued to them.

■ In any view the stock represented by the trust receipts was outstanding and had been from the day of its issuance under

the "Hook Plan" as a part of the petitioner's capital. The only thing the stock trust did was to withhold the stock owners' right to vote the stock during the term of the trust. But the stock was necessarily outstanding as representative of the trust receipt holders' contribution to the petitioner's capital. Nothing has been done to defeat that interest and, certainly, its status as outstanding stock of the petitioner was unaffected by the termination of the voting trust even though that was accomplished consonantly with the provisions of the plan. The unclaimed stock for which stock trust receipts are still unsurrendered was therefore properly included in determining the amount of the petitioner's outstanding voting stock.

■■ Nor is it of any consequence that the trust receipt holders cannot vote the stock to which they are entitled until stock certificates therefor have been issued to them. The stock is voting stock none the less. It is the voting privilege with which a particular stock issue is endowed and not whether it is voted which determines its voting character within the intent of Section 141 of the Revenue Acts of 1932 and 1934. The situation is no different than that of any purchaser of shares who fails to have his acquisition registered timely on the books of the issuing company. The right to perfect a stock transfer lies with the one entitled to the shares. Cf. Pacific National Bank v. Eaton, supra, loc. cit. But the failure to exercise the right so to act is without any influence whatsoever upon the voting character of the stock.

■ The petitioner further argues that the Commissioner concedes the validity of its contention when he excludes from the petitioner's outstanding stock the serial preferred shares held in reserve for conversion of the serial bonds. This argument patently fails to recognize the difference between a corporation's creditor and an owner of a participating interest in the corporation's net estate,—the difference between a lienor and an equity owner. Until the bondholders accept the authorized conversion stock in exchange for their bonds, the stock remains unissued and forms no part of the corporation's capital stock liability. And, in this same connection, it may be said that the journal entry made by the petitioner debiting the non-serial preferred stock account with the par value of the shares covered by the outstanding trust receipts and setting up the stock-conversion liability account by a reciprocal credit item was a legally inconclusive bookkeeping entry (Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 72, 39 S.Ct. 35, 63 L.Ed. 133; Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187, 38 S.Ct. 467, 62 L.Ed. 1054) and wholly incapable of reducing the petitioner's actually outstanding stock.

The decision of the Board of Tax Appeals is affirmed.